Michael Robert KOBOS, a minor child two years of age, By and Through Michael KOBOS and Rebecca Kobos, his parents and next friends; Michael Kobos and Rebecca Kobos, Appellants (Plaintiffs),

v.

Charles EVERTS, M.D.; Richard G. Sugden, M.D.; Kenneth L. Lambert, M.D.; Kenneth L. Lambert, M.D., P.C., a Wyoming professional corporation; Teton Radiology Associates, P.C., a Wyoming professional corporation; James R. Little, M.D.; Thomas Pockat, M.D.; Jackson Pediatrics, P.C., a Wyoming professional corporation; John Does I–X; and Doe Partnerships, Corporations and/or Other Entities I–X, Appellees (Defendants).

No. 86–12.

Supreme Court of Wyoming.

Jan. 17, 1989.

Rehearings Denied Feb. 28, 1989.

Appellants' Motion for Costs on Reversal Granted in Part and Denied in Part Feb. 28, 1989.

Lawrence B. Hartnett, Jackson, for appellants.

J.E. Vlastos of Vlastos, Brooks & Henley, P.C., Casper, for appellees Everts and Teton Radiology Associates, P.C.

Frank D. Neville and Michael Golden of Williams, Porter, Day & Neville, P.C., Casper, for appellee Sugden.

Paul B. Godfrey of Godfrey, Sundahl & Jorgenson, Cheyenne, for appellee Lambert.

Carl L. Lathrop of Lathrop, Rutledge & Boley, Cheyenne, for appellee Little.

Lawrence A. Yonkee of Redle, Yonkee & Arney, Sheridan, for appellee Pockat.

Before CARDINE, C.J., THOMAS, URBIGKIT and MACY, JJ., and BROWN,* J., Retired.

URBIGKIT, Justice.

Presented for appellate review is a six week medical malpractice trial against five physicians involving claims of improper hip treatment of osteomyelitis and septic arthritis of a one year old child, which resulted in verdicts in favor of four defendants and directed verdicts for all. The issues encompass excluded witnesses, denied cross-examination, directed verdicts and contended erroneous negligence instruction.

We reverse and remand for retrial.

## I. ISSUES

Although variously stated by appellants and the five separate appellees who are differently affected, the appellate issues presented include:

* Retired June 30, 1988.

1. Basic medical malpractice negligence instruction;

2. Directed verdict for the radiologist;

3. Subsequent directed verdicts for other appellees after they secured *a favorable jury verdict;*

4. Trial court decision denying appellants the right to call the appellee doctors as adverse witnesses during their case in chief; and

5. Contested witness exclusion and evidentiary decisions of the trial court:

a. Limitation on testimony of appellants' expert radiologist to consider standard of care as contributory to the injury sustained;

b. Limitation of testimony of expert witnesses regarding standard of care of radiologist which was rejected either as cumulative or not competent;

c. Denied use of Michael Lagios, M.D. as an expert witness on the basis that his testimony would be cumulative; and

d. Denied use of Lawrence Madoff, M.D. as an expert witness on the basis that his testimony would be cumulative.

## II. FACTS

Appellants include Michael Robert Kobos, a young child, and his parents of Jackson, Wyoming. In 1981, as the date of these events, the one year old developed a right hip pain. The patient was first evaluated in office and through telephone contact by Jackson doctors, James R. Little, M.D. and associate intern, Thomas J. Pockat, M.D. With the young child's condition producing "essentially normal x-rays," he was then seen by a general pediatrician, appellee Richard G. Sugden, M.D., whose office was in the same building as Dr. Little's. Consultation followed with yet another doctor, appellee Kenneth L. Lambert, M.D., a Jackson orthopedic surgeon. In this period of regular examinations as the child's problem continued, x-rays were taken and reviewed by appellee radiologist Charles Everts, M.D., with the continued finding of an essentially normal condition for the medical evaluation.

After about two and one-half months of this course of action with care limited to continuous office visits and no improvement, medical reference was made by Dr. Sugden for the child to be evaluated at the University of Utah Medical Center in Salt Lake City, Utah. The serious condition as diagnosed in Utah required apparent surgery, which was done by return to Jackson and performed by Dr. William Mott. Following surgery, the diagnosis was made of chronic osteomyelitis (infected bone).

As a result of either a developmental infected bone condition or surgical misadventure by Dr. Mott, growth plate damage resulted to the femur which will bring about significant future hip growth and use problems for the child. The broad character of factual issues considered at trial was whether the delayed medical attention while the infected bone condition developed precipitated the recognized injury or whether Dr. Mott, in final curative surgery, caused the permanent injury damage during the surgical process. Consequently in litigative approach, appellees denied diagnosis delay or treatment fault and blamed Dr. Mott as the surgeon who operated. The record of the lengthy trial can be summed up as including complicated evidence and a significant number of expert witnesses. Qualification of appellants' expert witnesses at trial was particularly painstaking in time, detail and opposition.

## III. PROPER INSTRUCTION

A principal issue in this appeal is appellants' challenge to the instructions, which included Instruction No. 18 as subject to the most detailed objection at trial and upon appeal. Instruction No. 18 states:

You are instructed that physicians and surgeons are not liable for mere errors of judgment, provided there has been a careful examination and ordinary care and skill has been exercised.

In other words, if, from all the evidence it appears by a preponderance that the acts or omissions of the defendants, each or all of them, upon which plaintiffs' claims are predicated clearly in-

volved and constituted an exercise of an honest judgment, arrived at after careful and necessary investigation, and

    a. The judgment is approved by a respectable portion of competent and reputable physicians or surgeons in the same line of practice, and

    b. There is nothing to indicate that the approval is not honestly made, or that the approval, the judgment or the acts or omissions are unreasonable,

Then, the defendants, each or all of them, are not liable.[1]

1. Eight other specific medical malpractice instructions were given, which included in general text:

INSTRUCTION NO. 8

The Plaintiffs contend that Michael Robert Kobos was at different times a patient under the care and treatment of each of the Defendant doctors. Plaintiffs claim that the Defendants, each or all of them, were negligent in their care and treatment of Michael Robert Kobos, which negligence was the proximate cause of injuries and damages suffered by Plaintiffs.

Each Defendant denies the Plaintiffs' claim asserted against him.

The Plaintiffs have the burden of proving their claims against each Defendant by a preponderance of evidence.
(The factual basis for the denial of patient-doctor status implicit in the instruction is not demonstrable from trial evidence.)

INSTRUCTION NO. 9

In this action, the Plaintiffs have the burden of proving by a preponderance of the evidence with respect to *each* Defendant the following:

    1. The Defendant was negligent; and

    2. The negligence of the Defendant was the proximate cause of the injury to the Plaintiffs; and

    3. The nature and extent of the injuries claimed to have been so suffered, the elements of Plaintiffs' damage and the amount thereof.

In determining whether an issue has been proved by a preponderance of the evidence, you should consider all of the evidence bearing upon that issue regardless of who produced it. The existence of such proposition must be more probable than its nonexistence. [Emphasis in original.]

INSTRUCTION NO. 10

Generally, negligence means the failure to use ordinary care.

Negligence as that term is used in these instructions with respect to the Defendant physicians means the failure to exercise the skill, diligence and knowledge, and to apply the means and methods which would reasonably be exercised and applied under similar circumstances by members of the profession in good standing and in the same line of practice.

The burden is upon the Plaintiffs to show by a preponderance of the evidence that each Defendant failed to exercise the degree of care and skill required from him.

INSTRUCTION NO. 11

It is the duty of a physician or surgeon who holds himself out as a specialist in a particular field of medical, surgical or other healing science, to have the knowledge and skill ordinarily possessed, and to use the care and skill ordinarily used, by reputable specialists practicing in the same field and under similar circumstances.

One who holds himself out as a specialist in that field and who undertakes diagnosis or treatment in his speciality is required to use the skill and care required of such a specialist.

INSTRUCTION NO. 12

In order to prove negligence, it is necessary for Plaintiffs to prove by a preponderance of expert medical testimony that a Defendant doctor failed to use the standard of care given to you in the foregoing instructions and such failure was a proximate cause of the injury complained of.

INSTRUCTION NO. 13

If the origin of the alleged injuries is obscure and not readily apparent, or if there are several equally probable causes of the condition, it is the burden of the Plaintiffs to prove by a preponderance, through competent expert medical testimony, that among the possible causes of the alleged injuries there is a reasonable probability (that is to say, the most likely cause was) the negligence, if any, of each Defendant.

INSTRUCTION NO. 16

You are instructed that in rendering medical services to a patient, a physician does not impliedly warrant or guarantee the success of his treatment or operation. The physician does impliedly warrant that he possesses and will exercise such professional skill and learning as are ordinarily possessed by medical practitioners practicing in the same field and under similar circumstances.

INSTRUCTION NO. 17

The law presumes that a physician or surgeon has carefully and skillfully treated or operated on his patient. There is no presumption of negligence from the fact of an injury or adverse result. However, this presumption is rebuttable and may be overcome by a preponderance of the testimony and evidence which establishes negligence or lack of reasonable care on the part of a physician or surgeon in his medical diagnosis, his performance of surgical procedures, and his care and treatment of patients.

Appellants assert that Instruction No. 10 was a correct articulation of the law and that Instruction No. 18 was improper as contrary to *Vassos v. Roussalis,* 625 P.2d 768 (Wyo.1981) (*Vassos I*) and *Vassos v. Roussalis,* 658 P.2d 1284 (Wyo.1983) (*Vassos II*). We agree.

In *Vassos I,* 625 P.2d at 772–73, as recognizing that a malpractice action is usually a form of negligence litigation, this court observed:

> [T]he existence of the physician-patient relationship established the duty. The standard is fixed as that which is required of a reasonable person in light of all the circumstances. * * * A malpractice contention is also one of those circumstances. The more specific standard for malpractice actions is that a physician or surgeon must exercise the skill, diligence and knowledge, and must apply the means and methods, which would reasonably be exercised and applied under similar circumstances by members of his profession in good standing and in the same line of practice. * * *
>
> The skill, diligence, knowledge, means and methods are not those "ordinarily" or "generally" or "customarily" exercised or applied, but are those that are "reasonably" exercised or applied. Negligence cannot be excused on the grounds that others practice the same kind of negligence. Medicine is not an exact science and the proper practice cannot be gauged by a fixed rule. * * * * * * such circumstances are not of such common knowledge, the jury must depend upon testimony of experts to explain the standard and thus prevent a conclusion based on conjecture and speculation. * * * In other words, an additional question of fact must be answered when the circumstances are such that the reasonable person standard is not within the common knowledge of the jury.

Furthermore, strict adherence to the so-called locality rule is not appropriate. *DeHerrera v. Memorial Hospital of Carbon County,* 590 P.2d 1342 (Wyo.1979); *Vassos II,* 658 P.2d 1284. We cannot accommodate acceptance of the instruction given within the criteria of the *Vassos* rule after the timely objection at trial that the instruction would confuse or mislead the jury as to the appropriate principle of law. *Cervelli v. Graves,* 661 P.2d 1032 (Wyo. 1983). The phraseology given simply does not define a duty of due care but bespeaks in responsibility to moral decision and honesty, and as the principal instruction, constitutes reversible error. Intent is not a factor of negligence since negligence precludes intended conduct. *Globe Indem. Co. v. Blomfield,* 115 Ariz. 5, 562 P.2d 1372 (1977); 65 C.J.S. *Negligence* § 3 at 473 (1966); W. Prosser & W. Keeton, The Law of Torts § 31 at 169 (5th ed. 1984).

A leading authority has been identifiable within the Wyoming criterion which provides that there are two applicable standards of care to be applied in malpractice cases.

> The first, which was correctly charged, holds the doctor to the standard of care measured by the knowledge and ability of the average physician or specialist in good standing in the community where he practices. This is the standard of reasonable care. Liability is premised upon the failure to exercise reasonable care, so measured. A doctor is also subject to a separate duty which requires him to use his best judgment, but which does not make him liable for mere error in judgment, provided he does what he thinks is best after careful examination. * * * "An error of judgment charged is appropriate in a case where a doctor is confronted with several alternatives and, in determining the appropriate treatment to be rendered, exercises his judgment by following one course of action in lieu of another."

1 S. Pegalis and H. Wachsman, American Law of Medical Malpractice § 2:9 at 69, 71–72 (1980) (quoting *Pike v. Honsinger,* 155 N.Y. 201, 49 N.E. 760 (1898)). It is noteworthy where a careful examination is given and clear alternative treatment courses exist, that an error of judgment charge may additionally be appropriate. Appellants were entitled to contend that the alternatives were not embraced in this

case since, generally speaking, nothing was done during the critical period as medical treatment which effectively addressed the physical problem as later disclosed by x-ray analysis and surgical intervention.

The instructions must be considered as a whole in order to determine whether the instructions as a whole are fair. But the introductions must clearly reflect the factual situation presented in the case as well as the applicable law.

1 D. Louisell and H. Williams, Medical Malpractice § 11.38 at 11–134 (1988) (footnotes omitted). The test of standard of care in a malpractice case is ordinary skill and diligence as possessed by members of the profession generally. "Reasonable and ordinary care, skill, and diligence" is the test denominated in 4 Reid's Branson Instructions to Juries, ch. 146, § 2442 at 473 (1987 Cum.Supp.). See similarly, PIK 2d 15.01 at 66 (2d ed. 1977) (although continuing to include some category of the locality rule). It is apparent that there is a difference in the concepts of the law between a bad result achieved with care and a less than careful bad choice. Excluding the Wyoming deleted locality rule, the Illinois Pattern Jury Instructions properly inform:

In [treating] * * * a patient, a [doctor] * * * must possess and apply the knowledge and use the skill and care that is ordinarily used by reasonably well-qualified [doctors] * * * in similar cases and circumstances. A failure to do so is a form of negligence that is called malpractice.

IPI 2d 105.01 at 319 (1971).

A physician's conduct * * * must be measured against what a physician having and using that knowledge, skill and care of physicians practicing in the same field of practice in the same or similar locality at the same time would or would not do under the same or similar circumstances.

CJI 2d 15:2 at 313 (1988). The mere error in judgment criteria as relied upon by the trial court for instruction comes from *Wright v. Conway*, 34 Wyo. 1, 241 P. 369 (1925). That concept is now subsumed within the modernized standards for present day professional practitioners invoking skill, diligence, knowledge, and application of means and methods reasonable under the circumstances by persons within the profession. Clearly, as we specifically stated in *Vassos I*, 625 P.2d at 772, "[n]egligence cannot be excused on the grounds that others practice [or approve of] the same kind of negligence." Under the misdiagnosis non-action thesis of appellants' claims of negligence, the jury instruction was improper.

## IV. DENIAL OF RIGHT TO CALL APPELLEES AS ADVERSE WITNESSES IN APPELLANTS' CASE IN CHIEF

During trial, appellants were advised by the trial court, at a point which, as a consequence, was near the end of their case in chief, that:

You will not be permitted to call the Defendant Doctors as adverse witnesses because it's the judgment of this Court if they are called for direct examination and you have the opportunity to cross-examine on the substance of their testimony, this case is going to go faster. That's based not only upon my experience, in general, that that is a quicker way to handle adverse parties but it's also based upon what I've observed in this courtroom concerning what's happened in this courtroom with respect to individual witnesses.

You think the Court is unreasonable. The Court believes that the length of examination of most of the witnesses in this case has been unreasonable and that a good deal of time could have be[en] saved with respect to—could have be[en] saved with examination and cross-examination that was more directed and to the point.

Early the following week, the decision was reiterated:

Now, for the record, the Court indicated last week that it would not allow the Plaintiffs to call the Defendants during their case in chief and would require the Defendants to put them on the stand. Now, the reason that the Court did that

is because the testimony in the case is going slow. It was the Court's considered opinion that the testimony would go quicker if the direct examination brought out the testimony of the doctors, leaving the Plaintiffs with the right to cross-examine. And that that would go quicker in the considered opinion of the Court because the Court is of the opinion based upon several weeks of trial and several weeks of experience with witnesses that are either perceived as being adverse by the Plaintiffs or are adverse witnesses, in fact, to the Plaintiffs, that during cross-examination in Plaintiffs' case, the examination has gone slowly because Plaintiffs' Counsel finds himself in the position during the presentation of his case in chief of wanting to elicit from the adverse parties the testimony that is important to his case in chief but to avoid the testimony of the adverse parties, which is more related to the defense and which is adverse to the case in chief. And because the Court perceives that Counsel finds themselves in that position, Counsel perceives—or the Court perceives Counsel as going very slowly and carefully, attempting to avoid during his case in chief, the unfavorable aspects of the testimony of the adverse parties. In the attempts to avoid those unfavorable aspects, the examination goes slowly. The Court, in its judgment, thought that if the adverse nature of the testimony is laid out on the table quickly, that Counsel would then be—would be alleviated— or the problem that Counsel faces of trying to avoid that testimony would be alleviated because it would be out on the table and Counsel would not have to be so careful but could just come in and the whole process would go quicker.

The subject was again reanalyzed by the trial court after all other case in chief witnesses had been called as then closing that trial segment with continued adverse examination denial:

Well, it's very doubtful at this stage of the game that the Defendants are not going to be called to the stand. We'll know that after we handle the motions. Okay. So let's handle—We'll deal with the testimony of the Defendant Physicians offered in Plaintiffs' case in chief at the same time that we deal with the motions for directed verdict that are going to be made this morning. In other words, if it appears that testimony of the Defendant Doctor is going to be critical to any motion for a directed verdict insofar as the Plaintiff is concerned, then the Court is in a position of dealing with that by allowing that Doctor to be called. If it's not critical, then the Court can stand by its previous ruling that we'll do the * * * direct examination and you get your crack at them through cross-examination.

The status of the issue on appeal is problematical since although discussed, it is not generally addressed as a designated issue for appeal and is contested by only Dr. Everts in argument. None of the litigants in appellate brief have furnished citations that a trial court can or cannot, as a matter of discretion, generally deny to plaintiff the right to call an opposing party as an adverse witness. Cf. *Hall v. Hall*, 708 P.2d 416 (Wyo.1985), cited by appellants. In anticipation that the problem will not reoccur on retrial, this court need not presently explore whether any circumstance could occur which would justify this kind of a general restriction on trial development by a litigant.[2]

## V. DIRECTED VERDICT FOR RADIOLOGIST

Without being afforded the opportunity to call the physician radiologist as an adverse witness to determine what his activities and function may have been, the trial court granted a directed verdict in his behalf at the close of appellants' evidence.

**2.** Within the penumbra between due process, *Boddie v. Connecticut,* 401 U.S. 371, 377, 91 S.Ct. 780, 787, 28 L.Ed.2d 113 (1971), and reasonable control over the presentation of evidence, *McCabe v. R.A. Manning Const. Co., Inc.,* 674

P.2d 699 (Wyo.1983), any restriction on rights of litigants to plan and present their case or for general evidentiary exclusion pursuant to W.R. E. 403 should tread softly.

Thereafter, in appellees' case after trial court announcement of the directed verdict, the ex-litigant testified as an expert witness in behalf of the other appellees.[3] In consideration of appellants' evidence and cross-examination, the trial court justified by oral explanation to the attorneys why he would grant the directed verdict:

And when you look at all of the evidence with respect to Dr. Everts in that sense and in that light, then the Court concludes that the evidence, in the light most favorable to the Plaintiffs, establishes that not only did Dr. Everts not fail to properly read x rays but that evidence, at best, establishes that it was a judgment call for Dr. Everts. The beauty is in the eye of the beholder, so to speak.

Now, finally, the testimony clearly is that you can't diagnose osteomyelitis or septic hip in this case from the x rays. At least not the x rays—I can say it that way. You can't diagnose this by the x rays. You can diagnose changes but you cannot tell what the changes are. And even if one were to conclude that there were changes on October 14 and 15 at the time of the last x ray plate and the last bone scan of Dr. Everts, the evidence in the light most favorable to the Plaintiffs indicates that in order to diagnose septic hip and osteomyelitis, something more had to be done. And so even if there was a failure to properly read those two radiology materials, there's no evidence of any direct, proximate cause between that failure and the injuries that the Plaintiffs contend occurred, those injuries being from osteomyelitis and septic hip which was not treated, which conditions cannot be diagnosed by x rays.

Intrinsic to appellants' case was evidentiary discussion of the duty of the radiologist to examine and report which is encompassed within a standard of due care to his patient. In earlier discussion before

the directed verdict had been granted, the trial court had analyzed:

It would appear to the Court in this case that the uncontradicted evidence of all of the experts is that Dr. Everts had no duty to diagnose; that he had no duty to treat.

This characterization of the duty or lack thereof of the radiologist is directly contrary to common reasoning (to determine what may be seen) and contrary to general precedent. *Clayton v. Thompson*, 475 So. 2d 439, 442 (Miss.1985) (quoting *Hall v. Hilbun*, 466 So.2d 856 (Miss.1985)):

[E]very doctor "has a duty to use his or her knowledge and therewith treat through maximum, reasonable, medical recovery, each patient, with such reasonable diligence, skill, competence, and prudence as are practiced by minimally competent physicians in the same specialty or general field of practice *throughout the United States*, who have available to them the same general facilities, services, equipment and options." [Emphasis in original.]

[P]roximate cause arises when the omission of a duty contributes to cause the injury. *Gardner v. National Bulk Carriers, Inc.*, 310 F.2d 284 (4th Cir. 1962) cert. denied, 372 U.S. 913, 83 S.Ct. 728, 9 L.Ed.2d 721 (1963). *Harvey v. Silber*, 300 Mich. 510, 2 N.W.2d 483 (1942). "Proximate cause here is implicit in the breach of duty. Indeed, the duty would be empty if it did not itself embrace the loss as a consequence of its breach." *Gardner*, supra, at page 287.

Id. at 445. We agree with appellants' position with reference to *Vassos II*, 658 P.2d 1284 that whether a duty exists and the scope of that duty are questions of law for the court. Id. at 1287. We would also agree with case law and text authority that radiologists have responsibilities to patients and to other physicians which are similar to those of pathologists—accurate diagnosis. 1 D. Louisell and H. Williams,

---

**3.** Appellants characterize the status of the directed verdict for Everts:

It must be emphasized that after Appellee Everts received a directed verdict in his favor he appeared at trial as an expert witness for

the remaining Appellees, and while still glowing with the halo of innocence, damned Dr. William Mott as the cause of young Michael Kobos' devastating injuries.

supra, at § 3.23 at 3–82. See also, *Keen v. Prisinzano*, 23 Cal.App.3d 275, 100 Cal. Rptr. 82 (1972). Factually, the circumstance that after x-rays were taken in the Salt Lake City clinic and immediate medical attention found to be required, belies adequacy of the earlier care given to the patient by the Jackson radiologist to the extent at least that a question of fact for the jury was created. *DeHerrera*, 590 P.2d 1342.

■ As an early witness, appellants called Dr. Maurice O'Connor who, after initial medical school graduation, spent time in general practice, then military service, and thereafter was trained for specialization in diagnostic radiology. While in that pursuit, he also graduated from law school and has since described his activity as 75% to 80% in pure medicine in the diagnostic radiology specialty and 20% to 25% or less in forensic medicine. Extended, detailed, and continued objection started from the first and continued to the last of his testimony during the two and one-half day session while he was a witness. The principal attack came by denial of appellees that the witness could properly state an opinion that the medical diagnosis for the small child should have come sooner and the treatment should have been better in regard to the service by all appellee witnesses. In broad category, the type of inquiry that developed has since been addressed by this court in *Oukrop v. Wasserburger*, 755 P.2d 233 (Wyo.1988).

Despite those constant objections by appellees, Dr. O'Connor specifically testified that in his opinion the standard of performance of radiologist Dr. Everts fell below the standard of appropriate care. An attempt was further denied in examining the witness to connect described insufficiency of radiology service by cause to the later discovered hip condition. In sustaining latter objections, the trial court stated that "[t]he Jury doesn't need assistance from an expert in that area. The objection is sustained." Subsequently, the following question was asked:

Well, for the record, I have to ask you to put back on your radiologist hat and tell me whether you have an opinion as to whether or not the failure of Dr. Charles Everts as a radiologist to meet the standard of care required of him had any causal relation to the condition in Mikey Kobos' hip which ultimately resulted as you've described it on these films?

The question was answered yes, and the requested opinion floundered on a *lack of foundation objection* as well as *competency* as sustained. Inquiry of counsel followed and the trial court responded:

THE COURT: Do you want me to tell you on the record, in front of the Jury?

MR. ANDREW HARTNETT: Beg your pardon?

THE COURT: Do you want me to tell me [sic] on the record?

MR. ANDREW HARTNETT: May be I would rather you tell me off-the-record, out of the presence of the Jury.

THE COURT: Okay. Then let's just leave it where it sits.

The thesis of the trial court was then later explained by the previously quoted order granting the directed verdict. Essentially, the record presents a legal determination in divergence with the factual record as to the responsibility of the medical doctor practicing in the specialty of radiology. The trial court denied to appellants the intrinsic expert witness opinion to completely define the standard of care required.

It is noteworthy how appellee Dr. Everts in brief describes the radiologist's participation in the medical practice:

Everts read or interpreted the plain x-ray films and the bone scan films. In this regard Everts submitted written reports which are a part of the hospital records or chart. The actual procedure in taking the films, both the plain films and the bone scan films, is done by technicians and not by Everts. This is the usual method or procedure in taking and interpreting radiological tests or procedures. Everts did not see or touch Michael Kobos with respect to the plain films and did not actively participate in the procedure generating the bone scan films. Several of the exhibits offered by

Appellants include copies of the reports of Everts; however, the same are within the hospital chart/record (Exhibit 2). The plain x-ray films are designated Exhibits 9–1 through 9–22 and the bone scan films are designated as Exhibits 11–7 through 11–10.

Therefore, the involvement of Everts consists entirely of his interpretation of the plain x-ray films taken on September 9, September 15, and October 14, and the bone scan films made on October 15, 1981.

Surprisingly, it is questioned that Dr. Everts owed a duty to the patient. Clearly, that contention should not be in factual dispute from this record or within today's medical world. If the physician performing the service for a patient expects to be paid, he has the duty of a doctor to his patient. Dr. Everts was a doctor and Kobos was his patient for radiology purposes. Really at issue was due care of the medical practitioner. When the directed verdict was granted, the witness provided by appellants of unquestioned competence and medical experience had on this record testified adversely (to the extent permitted) as to compliance with that due care standard.

Both the duty of the radiologist to make and adequately communicate a correct diagnosis is discussed in *Phillips v. Good Samaritan Hospital*, 65 Ohio App.2d 112, 416 N.E.2d 646, 649 (1979), where summary judgment was reversed as that court said:

Weighing the facts and competing inferences, as we must, in a light most favorable to the party opposing summary judgment, it is possible to find the existence of a causal relationship between a breach of duty and the injury suffered. * * * Once the physician-patient relationship has been found to exist, as could well be found here, the professional responsibilities and duties exist despite the lack of proximity, or the remoteness, of contact between the two as where a consulting physician is involved in the case in only a limited manner. Therefore, all physicians involved in a case share in the same duties and responsibilities of the primary care physician to the extent of their involvement.

It would seem in characterization that the ship had slipped sails somehow for directed verdict to be granted after the expert testimony had been given that the radiologist in performing a service of examining and reporting on x-rays did not meet the required standard of performance. An issue of negligence was presented. See a detailed analysis of liability, *Clayton*, 475 So.2d 439.

■ Appellants' problem with medical testimony relating to the radiologist's standard of care did not yet end. Called as a principal witness for appellants was San Francisco, California orthopedic surgeon, Dr. Kevin Harrington. After inquiry developed by examination of when appellants started to present the opinion of the witness in regard to the standard of care of the radiologist, a very extensive in camera discussion followed after which the trial court ruled in open court statement to the jury:

Ladies and Gentlemen of the jury. The Court has ruled that Dr. Harrington shall not be permitted to express an opinion, either directly or indirectly, concerning whether the x-ray and bone scan analysis done by Dr. Everts was negligent or careless or whether it was careful and prudent. Any further testimony by Dr. Harrington shall not be viewed or considered by you as applicable to the standard of care required of Dr. Everts. Dr. Lambert's objection at the testimony of Dr. Harrington to the effect that Dr. Lambert should have read the bone scan, himself, is without foundation and has been sustained by the Court.

What this meant in trial procedure by trial court ruling was that the orthopedic surgeon was not competent to express an opinion about x-rays, which would also serve to isolate that doctor from responsibility whether or not the radiologist had made a mistake. Furthermore, this standard of medical practice would establish that the orthopedic practitioner had no independent

responsibility to utilize his knowledge of x-rays in patient diagnosis and treatment.[4]

Finally, from the standpoint of appellants as the developments worsened in character, objection was taken to the way this trial evolution was to be orally presented to the jury:

> My concern is that any such instruction to the Jury, in and of itself, intends to reflect on the credibility of Dr. Harrington and is additionally prejudicial to the Plaintiffs case and that no instruction at this point in the evidence is necessary at all. He has not expressed an opinion regarding Dr. Everts nor has he expressed an opinion as to the failure of Dr. Lambert in any way in his interpretation. He is qualified to read them and interpret them himself and the instruction would be grossly prejudicial to the Plaintiffs.

The expressed concern was not without unjustified substance in case progression as a trial development. We conclude that the restriction on the witness' testimony was unjustified and constitutes an abuse of discretion.[5]

## VI. OTHER ISSUES PRESENTED

In determination that a retrial is required, we would only consider other issues to the extent that a reoccurrence of question might again develop.

### a. Directed Verdicts Granted to Drs. Sugden, Lambert, Little and Pockat After the Entry of Defendants' Jury Verdict.

The considerable discussion of this issue by the litigants does not present any justiciable question for us to now determine. The case was submitted to the jury, which would not now presently justify our decision on a subsequent directed verdict after favorable verdict. We would, however, observe that citations to cases involving a judgment notwithstanding the verdict are misplaced, since a judgment notwithstanding the verdict is directed to adversely attack the verdict and not to serve as a compatible substitute. See *Baker v. Helms*, 527 So.2d 1241, 1243 (Ala.1988) for evidentiary test. In concluding that this particular problem will not likely reoccur upon retrial, a further review becomes unjustified since this result with another favorable verdict could not call for application of W.R.C.P. 50(b). *Mayflower Restaurant Co. v. Griego*, 741 P.2d 1106 (Wyo. 1987); *Simpson v. Western Nat. Bank of Casper*, 497 P.2d 878 (Wyo.1972).

---

4. The specific decision and ratio decidendi of the trial court was stated to counsel:

   The Court notes that [prior trial judge] required the Plaintiffs to designate the experts that Plaintiffs would require in this case to meet their burden of proof and among those experts [was] a radiologist. Also among those experts [was] an orthopedic surgeon. Two separate doctors; two separate physicians.

   The Court, therefore, rules under Rule 403 that because the testimony of Dr. Harrington in the area of radiology will be cumulative, it will not be received by considerations of undue delay and waste of time. If the Supreme Court believes that I have abused my discretion in such a discretionary ruling, knowing more about this difficult trial than I do sitting in it, losing hair and developing ulcers, then it is the ruling of the Court that Mr. Vlastos' objections are sustained. Sustained on the basis that there's no foundation indicating that this Witness either knows or is competent to establish what type of standard,—either knows or can establish those standards under which radiologists as opposed to orthopedic surgeons must practice.

   Obviously, the cumulative characterization cannot now be sustained in face of the subsequently granted directed verdict on the basis of failure of proof of a violated standard. Consequently, the justification, if one is to be perceived, must be found in a generalized principle that an orthopedic surgeon is not qualified to testify as to radiology standards, *as a matter of law*.

5. It would not be totally dissimilar to consider that a jurist was not qualified to critique the academic analysis of his research assistant or the supervising architect to review the sufficiency of the contractor's work product.

   Physicians who are not specially trained in diagnostic roe[n]tgenology may be capable of interpreting many X-ray films with reasonable accuracy, but as a general rule they should not rely exclusively upon their own interpretation, except in very simple cases or in cases coming within their own special field such as urology or *orthopedics*.

   1 D. Louisell and H. Williams, supra, at 3–86 (emphasis added). As indicated, Dr. Harrington was an orthopedic specialist.

The significance in perspective to appellants is only relative to the topic of the excluded medical witnesses as being "cumulative." The problem is presented of the trial court's decisions that first the testimony of expert witnesses on violated standards of care is cumulative, and then without the support of appellants' case by the proposed expert opinion testimony to foreclose recovery by directed verdict on the basis of insufficiency of proof.[6]

### b. *Denied Testimony of Tendered Witnesses.*

■ Appellants challenge the denial of tendered testimony to be elicited from three proposed witnesses. Appellants had planned to present expert testimony from Dr. Lawrence Madoff and Dr. Michael Lagios in addition to the adverse examination of the appellees. Both witnesses had been deposed by appellees at appellees' convenience pursuant to specific trial court order. Dr. Lagios was a pathologist at Children's Hospital in San Francisco, California and Dr. Madoff, a pediatrician. Originally, pretrial objection had been taken to the late designations. Then after being deposed by trial court order following a change in trial judges, the objection to trial presentation was sustained on the basis that their medical opinion testimony "would be cumulative." The issue of late designation will not reoccur with a new trial, and consequently, its tortuous pathway in this extended record will not be pursued. Our consideration of the cumulative issue as an exercise of discretion is colored by the subsequent decision of the trial court after verdict that a directed verdict emplacing inadequate proof was proper. We are also distressed in present decision by incomplete opportunity to evaluate the prospective testimony as "cumulative," since by its very nature, it would have been relevant and material if admissible. Under any circumstance in the contextual development of this case with the categorization pursued by counsel and the trial court, it would appear that with an appellee pediatrician and with other pediatricians listed as expert witnesses for the defense, that app effort to present a pediatrician expert witness to establish a standard of care and its violation would not likely be cumulative. Additionally, the relevance of the pathologist to contest testimony of a pathologist who placed the blame on the succeeding surgeon, Dr. Mott, seems extraordinarily confined. With retrial, the cumulative nature of prospective inquiry should be more clearly delineated by the record if rejection reoccurs.

From this record, support for the exclusion criteria carefully defined in *Towner v. State*, 685 P.2d 45 (Wyo.1984) is not established. This court there said that "Rule 403 [W.R.E.] is an extraordinary remedy which should be used sparingly since it allows the court to exclude evidence which is concededly relevant and probative." Id. at 49. In the instant case, where two of the appellee doctors were pediatricians and appellants were disallowed the right to call a pediatrician as an expert witness, that rationale is hard to justify. Discretion, in any event, has its limits as we said in *Martin v. State*, 720 P.2d 894, 897 (Wyo. 1986):

> Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously.

In a medical malpractice case, plaintiff requires expert testimony for proof. *Harris v. Grizzle*, 625 P.2d 747 (Wyo.1981). Denial of the pathologist's testimony is similarly questionable where the defense is postured on an approach to lay the blame onto the operating surgeon by defendant's pathological testimony. Availability of the tendered witness to plaintiff is similarly required to permit the litigant to have the same opportunity to have eleven men on

---

6. This complex, heavily contested and argumentatively pursued record bespeaks to the conception of the trial court as accommodated by the usage of Instruction No. 18 and directed verdicts that judgmental mistake cannot create liability if that decision is either that nothing was wrong or not to do anything; so that only if something is done wrong can liability develop.

the field of play. At the least, all witnesses reasonably available to provide substantive evidence should have been permitted to testify before the trial court executes or at least exiles plaintiffs' case to a never to be land. The general law is in accord. See *United States v. Davis*, 639 F.2d 239 (5th Cir.1981), cited by this court with approval in *Towner*, 685 P.2d at 49, where evidence was "independent corroborative testimony on a material issue." See likewise 2 D. Louisell and C. Mueller, Federal Evidence § 128 at 68 (1985). As is stated in J. Weinstein & M. Berger, Weinstein's Evidence § 403[06] at 403-95, 403-99 (1986):

> Certainly, Rule 403 does not mean that a court may exclude evidence that will cause delay regardless of its probative value. If the evidence is crucial, the judge would abuse his discretion in excluding it.

In a case surprisingly similar as involving denied testimony of a pediatrician witness, the court in *Johnson v. United States*, 780 F.2d 902 (11th Cir.1986) reversed the trial court's decision and plaintiff's verdict when the witness was to testify for defendant. Quoting Weinstein with approval, the appellate court found the trial court's action to be an abuse of discretion. The testimony of the expert witness had been excluded as cumulative when presented to support the expert testimony of two other witnesses in the death case. The appellate court considered that the litigant had the right, in this case the United States government under the federal Tort Claims Act, to present testimony which was more comprehensive and at least partially non-cumulative through use of a pediatrician to testify in opposition to pediatricians who were presented by the plaintiff.

The involved principles are well-stated:

> Not all evidence which is entirely duplicative is therefore cumulative and excludable. Evidence may vary in degree of persuasiveness, and when an item of proof which is offered on a point is very different in character or persuasive impact from an item of proof previously received, the former cannot be considered merely "cumulative" of the lat-

ter. Moreover, at times it is entirely reasonable for a party to insist, "One witness is good, but two or three will make my case much stronger, even though all will testify in a similar vein." In short, the discretion of the trial judge to exclude cumulative evidence must be exercised in a discriminating fashion, and with wisdom, particularly where the evidence in question goes to issues of central importance in the case.

2 D. Louisell and C. Mueller, supra at 74-75 (footnote omitted). See *Hill v. Bache Halsey Stuart Shields, Inc.*, 790 F.2d 817 (10th Cir.1986); *Bower v. O'Hara*, 759 F.2d 1117 (3rd Cir.1985); and *United States v. Fessel*, 531 F.2d 1275 (5th Cir.1976).

The trial court retains considerable latitude even with admittedly relevant testimony in rejecting evidence which is cumulative or in requiring that evidence be brought to the jury's attention in a manner least likely to cause confusion. However, the litigant "is entitled to an opportunity to adduce relevant, competent evidence bearing on the issues to be tried." *Hamling v. United States*, 418 U.S. 87, 125, 94 S.Ct. 2887, 2911-12, 41 L.Ed.2d 590, reh'g denied 419 U.S. 885, 95 S.Ct. 157, 42 L.Ed.2d 129 (1974). Thus, evidence which in the context of the litigation is merely repetitious or time consuming may be excluded, but only if time consideration substantially outweighs the incremental probative value of the proffered evidence. M. Graham, Handbook of Federal Evidence § 403.1 at 179 (2d ed. 1986).

■ The denied testimony of proposed witness Betty Perkinson (Perkinson) is substantively complex. In compliance with trial court orders, appellants had filed, as a notice of an additional witness, Perkinson's name. That witness would testify that Jane Fairbanks (Fairbanks), a receptionist in the office of Dr. Little, had told her that she had improperly answered deposition examination when asked if she recalled the number of times that Rebecca Kobos had telephoned the doctor's office. Following designation, appellee Dr. Little filed a motion in limine to prohibit Perkinson from being called as a witness and the motion

was considered during trial and then rejected.

The sequence of developmental events on the issue is interesting. It is indicated in the record, although a copy of a deposition is not included, when appellants took the deposition of prospective witness Fairbanks as the office secretary for Dr. Little, that the witness testified she could not recall how many telephone calls were made to the office by the patient's mother during the defined period. As subsequently discovered evidence, appellants planned to tender testimony from an acquaintance of the witness, Perkinson, as noticed as an unexpected witness who would state that Fairbanks, the office secretary, had said to her sometime after the deposition, "I lied at my deposition." "The lawyers asked how many times Becky Kobos called over a specific period of time." "I told them I didn't know." "I wasn't about to help those lawyers." Then to conclude in the conversation between the two women, Fairbanks related "that woman called one hell of a lot."

For in camera trial inquiry, the office secretary Fairbanks was examined by appellants, after which a motion in limine was granted against use by appellants of any testimony from her which would invade the subject of the number of office telephone calls received and also the alleged discussion of her deposition testimony on the subject with Perkinson. Consequently, appellants contended that if she were to give the same testimony before the jury, she would again lie as she did in the deposition. The direction of the examination by appellants as denied by the motion in limine was to revisit the deposition inquiry of the witness, and if consistent, then impeach with subsequent statement of admitted untruth. As first approached by the trial court, the motion in limine to the initial inquiry of the office secretary was sustained as an attempt to prove the telephone calls through hearsay testimony offered under the guise of impeachment. The premise of the denial to appellants of this aspect of the examination of Fairbanks is unclear at this juncture on appeal. The foundational question for impeachment was excluded by the in limine decision as to Fairbanks so that the testimony of Perkinson was foreclosed in advance as lacking anything to impeach. The issue problem in present posture is found in justification for the motion in limine as limiting inquiry of a witness in regard to a prior inconsistent statement.[7] If, in fact, that would have been her sworn testimony before the jury as consistent with the deposition and inconsistent with statements to the acquaintance, then whether the in limine evidence would be properly emplaced to impeach as to the fact of the prior inconsistent statement would have a more justified structure for issue presentation. We need not presently assume how the witness might hereafter testify at trial and if she continues a course of denied recollection, whether the trial court has discretion to deny impeachment. The truth is to be found in either what the witness said in deposition or what the other witness stated she subsequently said. We do not find a relevancy question since obviously the theory of appellants was to prove parental concern and continued effort to secure some more satisfying medical recognition of perceived increasing physical problems of their baby boy. Consequently, we do not necessarily determine whether the impeachment examination is subject to discretional exclusion by the trial court, but do

---

7. We do not understand the argument of appellees in brief that the foundation question was never asked which is confusing in consideration of what the trial court said during the in camera questioning of both women:

If you have more questions for this witness [Fairbanks] on the substance of her testimony, then you certainly are going to be given an opportunity to ask her those questions. But this Court has ruled and there will be no questions asked of this witness concerning the foundations for impeachment through prior alleged inconsistent statements made to Mrs. Perkinson.

Thereafter, the subject was finalized:

Anything else, Andy [one of appellants' attorneys]? I'm just telling you how the cow ate the cabbage.

MR. ANDREW HARTNETT: I understand that the cabbage has been eaten, your Honor.

THE COURT: All right.

MR. ANDREW HARTNETT: I respectfully disagree with the Court.

not find a basis submitted for denial to appellants of the foundational inquiry of the office secretary.

This court had occasion in *Channel v. State*, 592 P.2d 1145 (Wyo.1979) to consider the impeachment and direct evidence issues implicit in W.R.E. 607 and 802. Clear approval for the process undertaken by appellants is indicated provided that a subsequent limiting instruction is given. In specific decision, what we have here is that the trial court determined to protect the office secretary from the "travail" of impeachment by being faced with the contention of her later statement that she committed perjury in a deposition and then reiterated in the in camera examination which indicated her intent to continue that posture for the jury presentation. Denial of the opportunity to appellants to establish the foundation for the impeachment by the first of two limiting trial court orders cannot be justified by direct citation of authorities presented in appellate briefs.

Detailed review of the prior inconsistent statement inquiry in use and function is found in two recent A.L.R. annotations.[8] It is notable that this court in Channel cites the first annotation and then the second annotation cites Channel as part of the progressively developing concept that permits use of prior inconsistent statements as evidence in defined circumstances. The not dissimilar subject of use of hearsay to prove prior statements if the witness is now unavailable by lost memory was considered by the United States Supreme Court in the 1988 term in approving usage for criminal prosecution, see *United States v. Owens*, 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988).

Although the application in Owens is different as involving substantive testimony rather than impeachment, the characterization which it afforded is relevant:

It would seem strange, for example, to assert that a witness can avoid introduction of testimony from a prior proceeding that is inconsistent with his trial testimony, see Rule 801(d)(1)(A), by simply asserting lack of memory of the facts to which the prior testimony related.

*Owens*, 108 S.Ct. at 845. The witness here, by statement that she could remember the number of telephone calls, was isolated by trial court order from testimony about her subsequent comment of deliberate misstatement.

Appellees' tailored their defense to the impeachment denial decision on an abuse of discretion concept as not clearly wrong in citing *Waldrop v. Weaver*, 702 P.2d 1291 (Wyo.1985); *Brockett v. Prater*, 675 P.2d 638 (Wyo.1984); and *Bacon v. Carey Co.*, 669 P.2d 533 (Wyo.1983). None of those cases involve impeachment of contended perjurious testimony. *Canyon View Ranch v. Basin Elec. Power Corp.*, 628 P.2d 530 (Wyo.1981) as also cited presents a relevancy question. The one case of somewhat similar character, *Diamond Management Corp. v. Empire Gas Corp.*, 594 P.2d 964 (Wyo.1979) addresses impeachment denial as harmless error since the compared testimony was not essentially dissimilar.

The record establishes that the perjury contention was a concern that the trial court did not want to be presented to the jury—even if true.[9]

---

**8.** First, Annotation, *Use of Prior Inconsistent Statements for Impeachment of Testimony of Witnesses Under Rule 613, Federal Rules of Evidence*, 40 A.L.R. Fed. 629 (1978) and the later Annotation, *Use or Admissibility of Prior Inconsistent Statements of Witness as Substantive Evidence of Facts to Which They Relate in Criminal Case—Modern State Cases*, 30 A.L.R. 4 414 (1984). The subject has presented problems since not without conflict in the federal courts. To be compared are *United States v. Garcia*, 530 F.2d 650 (5th Cir.1976) (approved and failure to give a limiting instruction was not plain error); *United States v. Rogers*, 549 F.2d 490 (8th Cir. 1976), cert. denied 431 U.S. 918, 97 S.Ct. 2182,

53 L.Ed.2d 229 (1977) (under fairness inquiry and with limiting instruction was admissible); and *United States v. Morlang*, 531 F.2d 183 (4th Cir.1975) (inadmissable). See comment and included citations of text authorities, 120 F.R.D. 299 (1987), relating to W.R.E. 607.

**9.** As appellee Little quotes in his brief, the trial court's reasoning related:

"THE COURT: I heard argument on it last night. I made a special trip to the Teton County Law Library and secured from that library legal materials which I then took home, along with the depositions of Mrs. Fair-

■ Yet another conflict on testimony is presented in this appeal. In cross-examination of Dr. Little, appellants' counsel inquired about his experience in the treatment of children who had osteomyelitis or septic arthritis. An irrelevancy objection was sustained. The inquiry followed an earlier motion to compel discovery which had required the doctor to answer questions concerning his treatment of MB, a specific patient with a similarly diagnosed condition. The relevancy may be indicated if we were to review the documents and file as furnished with discovery, but it is not in this record. Without an offer of proof at trial, this record fails to afford us a justification for disagreement with the discretional decision of the trial court. Assumption of fact in brief are not exchangeable for an adequately presented offer of proof in trial. *Nicholls v. Nicholls*, 721 P.2d 1103 (Wyo.1986); *Majority of Working Interest Owners in Buck Draw Field Area v. Wyoming Oil and Gas Conservation Com'n*, 721 P.2d 1070 (Wyo.1986).

We reverse and remand for retrial.

CARDINE, C.J., and THOMAS, J., filed special concurrence opinions.

> banks. And after dinner last night, I did my own reading on the law. I read the deposition of Mrs. Fairbanks; I studied the statement of the proposed testimony; came back into Court this morning; heard more argument on the issue. The Court doesn't feel the need for any further legal reference. So thank you very much, Mr. Hartnett, but I don't want them.
>
> MR. ANDREW HARTNETT: I take that as an order that I should not address the Court with legal argument?
>
> THE COURT: Yes, because it's a matter now of the law, not of the facts, and you can bring up the law with this or the Supreme Court at any time you want. Now, the Court has listened carefully to the testimony of Mrs. Perkinson. The uncontroverted—the uncontroverted evidence in this case will be that Mrs. Kobos called Dr. Little's office in late August and early September of 1981 to express her concerns about her child. The proffered testimony will not impeach any evidence to the contrary. The evidence doesn't impeach Mrs. Fairbanks, her testimony being that she doesn't recall. She has no recollection and that's not surprising. I couldn't tell you who called me last week. I know I had some telephone calls earlier this week but I can't tell you who called me. Thus, if it

BROWN, J., Retired, dissented in part and concurred in part and filed an opinion.

CARDINE, Chief Justice, specially concurring.

I concur in the opinion of the court and, with respect to instruction number 18, strongly urge that this kind of instruction should not be given a jury. It is argument, and it is confusing. Thus, it is incorrect to say that physicians and surgeons are not liable for mere errors of judgment. They are liable for error of judgment if those errors result from negligence, that is "the failure to exercise the skill, diligence and knowledge * * * reasonably * * * exercised * * * by members of the profession in good standing and in the same line of practice."

The balance of instruction number 18 seems to say that if the acts and omissions of the defendants are an exercise of honest judgment, and not unreasonable, defendants are not liable. This likewise is misleading and a questionable statement of law. The question is not whether the judg-

> doesn't have the purpose or the affect of impeaching the credibility of Mrs. Fairbanks and thereby discrediting the weight to be given her testimony, the only testimony being Mrs. Kobos' testimony that I called, then, the only other purpose for the testimony is to prove the truth of the hearsay asserted, which hearsay would be otherwise inadmissible.
>
> Now, this proffered testimony does something else in this case. This proffered testimony injects into the case an inference, an implication, that Dr. Little's a bad man being surrounded by those who would commit perjury. Now, it is the judgment of this Court after watching Mrs. Perkinson carefully and after considering all of the aspects of this case that if I were a Plaintiff's lawyer in this case, I would like to have the Jury think that on the other side of me are a bunch of perjurers and people who would be surrounded by perjurers. Now, if there are perjurers, there are remedies for that. But the remedies are not in this courtroom at this time with this Judge or with this Jury. Those remedies are with the Teton County Prosecuting Attorney, probably a Judge other than John Troughton, perhaps Judge Ranck and perhaps other Defense Counsel than those that are seated in this courtroom and, clearly, a different Jury.

ment of the physician and surgeon was honest or dishonest but whether the physician failed to exercise the skill, diligence, and knowledge reasonably exercised by others. Instruction number 18 states as a matter of law that a physician who acts honestly and reasonably is not liable. What if he acts honestly and unreasonably —or acts dishonestly and reasonably? This kind of instruction is exceedingly confusing. More than that, the instruction as a whole seems to say in lay terms that a physician who acts honestly in reaching a judgment is not liable. That is not a correct statement of the law.

In the vast majority of these kinds of cases, it is enough to define for the jury negligence and cause in simple terms, as stated in instruction number 10 and other instructions found in the court's opinion.

Where a significant portion of the responsible medical community approves two different treatments for the same injury or condition, it is not negligence for a physician to choose one treatment over the other. For me, that does not involve an error of judgment at all. It is simply not negligence to choose either treatment. An example of two medical procedures for treating the same condition is the treatment of a ruptured disc. Neurologically the disc is removed without fusion. Orthopedically the vertebrae are fused. Both courses of treatment are common, accepted by the responsible medical community, and it generally is not negligence to treat a ruptured disc in either fashion.

An error is a mistake. A mistake may or may not result from negligence. But what is gained by telling the jury that an error carefully made does not result in liability? It is argumentative. It is confusing. It is a clever play on words which implies to the jury that a physician is not liable for an error in judgment. To balance the instructions, if number 18 is given, the court ought to advise the jury that a mere error in judgment is negligence for which a physician or surgeon is liable if such error results from negligence. As stated, it is better that neither instruction be given but that the term negligence be simply defined for the jury.

THOMAS, Justice, concurring specially.

I am in accord only with the result reached by the majority opinion. I have some views of my own with respect to the difficulties engendered by Instruction No. 18, and those views may accommodate more closely to the objection to that instruction by the plaintiffs as quoted in the separate opinion of Justice Brown. I perceive Instruction No. 18 as requiring the jury to accept the approval of the defendants' conduct by expert witnesses so long as that approval was honestly made and was reasonable. In his separate opinion, Chief Justice Cardine has pointed out some internal inconsistency in that instruction.

Beyond its inherent departure from established legal rules, my perception of the instruction is that it does create a standard for recovery which conflicts with other instructions which were given by the court and are quoted in the majority opinion. Particularly, it appears to me to be antithetical to Instruction No. 12.

Furthermore, it is not consistent with the general instruction, Instruction No. 1, which addresses the jury's role with respect to credibility of all witnesses. It is even more inconsistent with Instruction No. 6 relating to expert witnesses which reads as follows:

"A person is qualified to testify as an expert if he has special knowledge, skill, expertise, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates.

"Duly qualified experts may give their opinions on questions in controversy at a trial. To assist you in deciding such questions, you may consider the opinion with the reasons given for it, if any, by the expert who gives the opinion. You may also consider the qualifications and credibility of the expert.

"You are not bound to accept such an opinion as conclusive, but should give to it the weight to which you find it to be entitled. You may disregard any such

opinion if you find it to be unreasonable."

This court has articulated clearly the proposition that it is the prerogative of the trier of fact to determine what evidence is most dependable. E.g., *State ex rel. Wyoming Worker's Compensation v. Colvin*, 681 P.2d 269 (Wyo.1984); *Cederburg v. Carter*, 448 P.2d 608 (Wyo.1968); *Cimoli v. Greyhound Corporation*, 372 P.2d 170 (Wyo.1962). The vice in Instruction No. 18 is that, subject to the conditions attached, the jury is required by the instruction to accept the expert testimony. That is not, and should not, be the law. The jury is not required to accept it even if they find it to be honest and reasonable.

In addition, this court also has assigned specifically to the jury the evaluation of expert witnesses, suggesting that their testimony need not be accepted. E.g., *Oukrop v. Wasserburger*, 755 P.2d 233 (Wyo. 1988); *Thomas v. Metz*, 714 P.2d 1205 (Wyo.1986); *Reed v. Hunter*, 663 P.2d 513 (Wyo.1983). An additional vice in Instruction No. 18 is the statement that the jury must find for the defendants based upon the approval of the "respectable portion of competent and reputable physicians or surgeons." The tenor of the instruction is antithetical to the function heretofore assigned to the jury by our cases.

These problems with Instruction No. 18 were exacerbated by other rulings of the district judge. His limitation on the use of expert witnesses by the plaintiff and the limitation of testimony by some of those witnesses was troublesome. The members of the jury could have concluded that, in addressing these matters as he did, the trial judge clearly indicated his position that the expert witnesses called by the plaintiff were not among that "respectable portion of competent and reputable physicians or surgeons." The demand for a "respectable portion of competent and reputable physicians or surgeons" also is contrary to the judge's ruling with respect to cumulative testimony. These matters, together with the refusal of the court to permit the plaintiffs to call the defendants as adverse witnesses in presenting their case in chief which was then followed by directed verdicts for lack of proof, all made painfully obvious the deprivation of a fair trial so far as the plaintiffs were concerned.

I add that denying the plaintiffs the right to call the defendants as adverse witnesses in presenting their case in chief is not a neutral ruling. When called in the case presented by the defendants, counsel have a clear opportunity to tailor the testimony in chief. Cross-examination then can be severely limited to the scope of the direct examination, and it may turn out to be impossible for the plaintiffs to present the significant points supporting their theory. Furthermore, a substantial difference exists between the presentation by the plaintiffs, through questions permitted on cross-examination of salient points followed by an explanation, and the converse in which the defendants first of all present their story and counsel for the plaintiffs must then try to attack a prepared and planned presentation. In the context of weighing testimony, the latter is far less favorable to a plaintiff, which is why a plaintiff is permitted to call a defendant as an adverse witness in his case in chief.

BROWN, Justice, Retired, dissenting in part and concurring in part.

The majority holds that giving Instruction Number 18 was reversible error. It states that appellants' challenge to instructions is the principal issue on appeal. The court was particularly wroth because the trial court used the terms "honest judgment" and "honestly" in its instruction, and states that the instruction "bespeaks in responsibility to moral decision and honesty."

In the context of Instruction Number 18 and the other eight malpractice instructions, it is inconceivable that the jury could have been misled and thought defendants' conduct would be excused as long as their judgment was not fraudulent or morally improper.

Webster's Third New International Dictionary 1086 (1971), defines "honest" in part as: "candid presentation of the facts,"

"free of ostentation or pretense," "of a creditable nature." Honesty is defined on the same page as "adherence to the facts." In context, the words "honest" and "honesty" used in Instruction Number 18 could only mean adherence to the facts and the jury could not have rationally thought otherwise.

Arguably, terms more precise than "honest" and "honestly" could have been used in the instruction. However, these terms are not novel. In *Smith v. Beard*, 56 Wyo. 375, 110 P.2d 260, 270 (1941) (quoting *Staloch v. Holm*, 100 Minn. 276, 111 N.W. 264, 267 (1907)), this court said: " 'It would be * * * unreasonable to hold a physician responsible for an *honest error of judgment* on so uncertain problems as are presented in surgery and medicine.' " (Emphasis added.)

Appearing on the same page of the opinion in Smith, the terms "honest judgment" and "honestly made" are used. Justice Blume certainly was not using the terms honest and honestly as opposed to the terms fraudulent, lying, larceny or some other moral deficiency.

The Supreme Court of Minnesota wrote that at least twenty-nine other jurisdictions follow the rule that physicians are not liable for honest errors in judgment. In *Ouellette by Ouellette v. Subak*, 391 N.W. 2d 810 (Minn.1986), the court stated:

> "Cases of malpractice may be within the exception. A physician entitled to practice his profession, possessing the requisite qualifications, and applying his skill and judgment with due care, is not ordinarily liable for damages consequent *upon an honest mistake or an error of judgment* in making a diagnosis, in prescribing treatment, or in determining upon an operation, where there is reasonable doubt as to the nature of the physical conditions involved or as to what should have been done, in accordance with recognized authority and good current practice. * * *
>
> * * * * * *
>
> " * * * Most professional men are retained or employed in order that they

may give the benefit of their peculiar and individual judgment and skill. A lawyer, for example, does not contract to win a lawsuit, but to give his best opinion and ability. He has never been held to liability in damages for a failure to determine disputed questions of law in accordance with their final decision by courts of appeal. It would be just as unreasonable to hold a physician responsible for an *honest error of judgment* on so uncertain problems as are presented in surgery and medicine."

[Staloch,] 100 Minn. at 280–283, 111 N.W. at 266–67.

Moreover, in protecting a physician from liability for mere errors in judgment in choosing between alternate diagnoses or treatments, this court has followed a rule recognized by at least 29 other jurisdictions. See also W. Keeton, D. Dobbs, R. Keeton and P. Owen, Prosser & Keeton on the Law of Torts 186 (5th Ed.1984).

Id. at 814 (emphasis added and footnote omitted).

In *Watson v. Hockett*, 107 Wash.2d 158, 727 P.2d 669, 673 (1986), the court stated:

> The "error of judgment" instruction unanimously upheld by this court in Miller, and also proposed by Dr. Hockett in this case, is also proper:
>
> > "A physician or surgeon is not liable for an *honest* error of judgment if, in arriving at that judgment, the physician or surgeon exercised reasonable care and skill, within the standard of care he was obliged to follow."
>
> (Italics ours.) *Miller*, 91 Wash.2d at 160 n. 4, 588 P.2d 734. Henceforth, however, the italicized word "honest" should not be used in those cases where it is appropriate to give this instruction. This is because the use of the word "honest" imparts an argumentative aspect into the instruction which, as discussed above, does not coincide with current jury instruction practice.

See also *Perkins v. Walker*, 406 N.W.2d 189 (Iowa 1987); *Miller v. Kennedy*, 91 Wash.2d 155, 588 P.2d 734 (1978) ("honest"

error of judgment instruction upheld). In 61 Am.Jur.2d, Physicians & Surgeons, § 209 (1981), the term "honest error" is used in discussing professional judgment.

"No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, *stating distinctly the matter to which he objects and the grounds of his objection.*" W.R.C.P. 51 (emphasis added). At the instruction conference, counsel for appellants objected to giving Instruction Number 18, stating:

> In the first instance, your Honor, I think that *Vassos v. Roussalis*, where it defines what negligence is,—I mean, what standard of care is, impliedly overrules any case that would additionally instruct on the issue of error of judgments on the first instance. Probably the vast majority of any case in the exercise of medicine requires judgment. The question—and that evidence comes into the trial. It's up to the Jury to determine if, from the facts of the case, that's excused by knowledge, skill and diligence in the evidence. To instruct about judgment, particularly, calls the attention to the Jury of one of many issues that they've heard in the evidence and in certain circumstances, could—could be tantamount to issuing a directed verdict in our judgment.
>
> Two, I don't think anything in *Conway v. Wright* suggests that the language of the decision should be given as an instruction. And I think that, clearly, this sets up a situation where a professional judgment being exercised, in almost any case, requires the Plaintiffs to almost prove, you know, beyond a reasonable doubt or prove some kind of burden far greater than the law requires. The instruction, in my judgment, simply,—you know, it's unnecessary to give and it does tend to direct a verdict against because, you know, all I have to say is while this was a judgmental issue, that's for the Jury to decide.

It is most difficult to determine precisely what appellants are complaining about. At the instruction conference, they talk about the instruction imposing on them a burden of proof "beyond a reasonable doubt" and a tendency to "direct a verdict against them." It is noted in appellants' objection that they do not complain about the use of the terms "honest judgment" and "honestly." This latent concern about these terms apparently developed on appeal.

W.R.C.P. 51 is designed to assist the trial court to correct potential errors in the instructions. The purpose of the rule is defeated if alleged errors are asserted for the first time on appeal. Perhaps if appellant had properly objected, the court would have deleted the terms "honest" and "honestly" or substituted acceptable terms. Appellants' objection to Instruction Number 18 does not minimally comply with Rule 51, and they should not now be heard to complain.

In its opinion, the majority addresses other issues raised by appellants, and is critical of many of the trial court's rulings and determinations. However, the majority's reversal is not based on those additional issues. Those issues are discretionary matters with the trial court. I see no abuse of discretion and would therefore affirm the trial court in its determinations.

With respect to granting a directed verdict in favor of Charles Everts, M.D., the radiologist, I concur only in the result determined by the majority. I agree with the trial court that there was not competent evidence of any direct, proximate cause between the conduct and actions of Dr. Everts and the injuries appellants contend occurred. The trial court, however, improperly granted the directed verdict without allowing appellants to call Dr. Everts as an adverse witness in their case in chief. Had Dr. Everts testified as an adverse witness, it is highly unlikely that he would have made appellants' case, but appellants had a right to try to cure the deficiencies in their proofs through the testimony of appellee Everts.

I would reverse the trial court in granting a summary judgment to Dr. Everts and affirm in all other respects.