**Ray K. OUKROP, D.D.S.,**
**Appellant (Defendant),**

v.

**Dennis WASSERBURGER,**
**Appellee (Plaintiff).**

**No. 86–306.**

Supreme Court of Wyoming.

June 1, 1988.

Carl L. Lathrop, David D. Uchner, Nicholas G. Kalokathis and Peter K. Michael of Lathrop & Uchner, P.C., Cheyenne, for appellant.

Frank R. Chapman, R.E. Rauchfuss and Debra L. Cheatham, Beech Street Law Office, Casper, for appellee.

Before BROWN, C.J., and THOMAS, CARDINE, URBIGKIT and MACY, JJ.

THOMAS, Justice.

The critical question to be resolved in this case is whether the expert testimony of a pharmacologist-toxicologist is relevant in a case involving toxic injuries to a human being from a drug overdose when the expert testimony consists of an interpolation of the results of experiments on animals in the absence of empirical data with respect to people. There is a collateral procedural issue as to whether the expert testimony was a surprise to the defendant attributable to a failure to designate properly the expert witness in accordance with the pre-trial order. The trial court ruled that there was no basis for the claim of surprise and permitted the testimony to be introduced at trial. We agree with the rulings of the trial court, and we affirm the judgment.

The appellant, Ray K. Oukrop, D.D.S. (Dr. Oukrop), appeals from an amended judgment, including costs, in the total amount of $751,816.37 awarded to the appellee, Dennis J. Wasserburger (Dennis), as the result of toxic poisoning and resulting injuries attributable to an overdose of the drug atropine. In his brief, Dr. Oukrop sets forth these issues to be resolved:

"I. Whether the district court abused its discretion when it permitted a professor of pharmacology, who was not a medical doctor and who had never examined or tested the plaintiff, to give to the jury his diagnosis and prognosis of the plaintiff's brain damage.

"II. Whether the district court abused its discretion when it permitted the pharmacologist's brain damage testimony even though that testimony was not set out in the pre-trial order.

"III. Whether the errors in admitting the pharmacologist's brain damage testimony were prejudicial."

Dennis restates these issues in this way:

"I. Whether the pharmacologist-toxicologist was properly designated or did he cause surprise.

"II. Whether the pharmacologist-toxicologist was competent to testify regarding the probable toxic effects of the poison atropine on the appellee.

"III. If any error was committed, was it prejudicial enough to require a new trial."

In a visit to Dr. Oukrop on January 7, 1984, Dennis sought advice with respect to the removal of his wisdom teeth. The product of that discussion was an appointment for oral surgery to remove the wisdom teeth on February 3, 1984. During the January visit, Dr. Oukrop prescribed four chemical substances to be taken by Dennis prior to the surgery. One of those was a prescription for:

"Atropine ¼ grain

Take ½ hour before dental appt."

The atropine that was prescribed is twenty-five times the normal adult dosage.

Dennis took the prescriptions to a pharmacist in Gillette to have them filled. The pharmacist observed the excessive dosage in the atropine prescription and telephoned Dr. Oukrop to discuss the dosage. In a manifestation of professional arrogance, which wise practitioners of the healing arts avoid, Dr. Oukrop refused to discuss the prescription with the pharmacist, requested that the pharmacist fill the prescription as written and hung up. The pharmacist then filled the prescriptions, as they had been ordered, and gave them to Dennis. On the morning of the scheduled oral surgery, Dennis took all twenty-five atropine capsules in accordance with Dr. Oukrop's direction.

Dr. Oukrop realized, prior to the surgery, that Dennis had taken a toxic dose of atropine in accordance with Dr. Oukrop's instructions. He also knew of the possible side effects of that overdose. After recognizing that there had been an overdose, Dr. Oukrop called a medical doctor seeking advice with respect to the potential side effects. The medical doctor confirmed the overdose and suggested to Dr. Oukrop that, if he was concerned, he should call the Poison Control Center. Dr. Oukrop's reaction was not a model of responsible behavior. Instead of calling the Poison Control Center—which he did eventually, more than twenty-four hours later—Dr. Oukrop proceeded with the surgery, after deciding that he would "just wait and see what Dennis was going to go through." Dr. Oukrop did not advise either Dennis or his mother, who were his friends and had been his patients for almost twenty years, that Dennis had taken a toxic overdose of atropine.

The testimony of two emergency room physicians, who had worked with the Wyoming Poison Control Center, revealed that Dennis' problems could have been avoided, or alleviated, to a substantial degree if Dr. Oukrop had informed someone of the overdose within approximately six hours. Treatment, in the form of giving Dennis something to induce vomiting, pumping his stomach, and giving him activated charcoal slurry and laxatives, could have been administered to eliminate the maximum possi-

ble amount of the atropine from his system. This treatment would have prevented most of the toxic effects of the overdose. At the trial, the same doctors testified about rate of absorption and that these were standard techniques to eliminate toxic substances taken orally.

On the way back to his home following the surgery, Dennis began to hallucinate and manifest unusual behavior. At 2:14 P.M., his mother called Dr. Oukrop to tell him of Dennis' behavior and her concern about that. Dr. Oukrop told her to give Dennis some soup and malted milk in one hour and that Dennis would be okay. The hallucinations became worse, and, at 5:30 P.M., his mother called Dr. Oukrop again; Dr. Oukrop again assured Mrs. Wasserburger that Dennis would be all right. At 9:00 P.M., in another telephone call, Dr. Oukrop instructed Mrs. Wasserburger to take Dennis outside for a walk, but that provided only temporary relief. After another call from Mrs. Wasserburger at 11:29 P.M., Dr. Oukrop promised to call her back, which he did. Dr. Oukrop never did explain to Mrs. Wasserburger that Dennis had taken a toxic overdose of atropine, nor did he suggest at any time that the Wasserburgers should obtain medical assistance. Dr. Oukrop even allowed Mr. and Mrs. Wasserburger to assume that Dennis may have been using illicit substances.

At 2:36 A.M. the next morning, Mrs. Wasserburger finally called the family physician about Dennis' unusual behavior. In the course of that conversation, she read the label from the atropine bottle to the physician who then told Mrs. Wasserburger what to anticipate and what to do. Dennis ran away from the family ranch house during this telephone conversation. The temperature was around thirty degrees, and Dennis was wearing only blue jeans, a velour shirt and moonboots. He thought he saw men chasing him with guns and shining lights on him. During his hallucinations, Dennis broke his glasses, ran into a barbed wire fence and got wet running through a creek. He also suffered a serious knee injury when he stepped off the top of a hill and fell forward through

the snow. He managed to make his way to a neighbor's ranch some two and one-half miles away from his home, and he spent the night in a haystack.

The next morning, Dennis still was hallucinating, and he saw the men who were after him blow up the haystack next to the one he was in. Assuming that they were going to blow up his haystack as well, Dennis left the haystack and was discovered by the neighbor. The neighbor persuaded Dennis to come into the house for some coffee and to telephone his parents. The Wasserburgers picked Dennis up and later took him to see the family physician. The physician examined Dennis, but, because of the length of time since the atropine had been administered, the physician was unable to suggest any treatment. The hallucinations continued throughout that day and into the following evening.

The next week, Dennis developed a jaw infection for which he eventually was hospitalized, treated and released. Evidence submitted at the trial indicated that his exposure and lack of rest following the oral surgery could have caused this infection. He returned to work February 16, 1984, but he had to quit a few days later because of his knee injury. That injury was treated by arthroscopic surgery in March, 1984. At the trial, Dennis and members of his family testified that he has difficulty remembering things, and his temper is more volatile. Furthermore, he is not as responsible as he was prior to the poisoning.

We turn first to the procedural attack upon the testimony of Dr. Allan C. Collins, an expert witness in pharmacology and toxicology. Dr. Collins testified as an expert witness in pharmacology-toxicology to a number of things, but the peculiar thrust of his testimony that generates the procedural issue was:

"Q. Based on those studies, doctor, do you have an opinion of what effect the overdose of atropine on Dennis Wasserburger will have on him in the future?
"A. Yes.
"MR. UCHNER: I object, your Honor, and move that the testimony be stricken. This testimony, again, calls for specula-tion and conjecture. There are certain possibilities involved in this case. This witness is not qualified to give a medical opinion as to the particular plaintiff in this particular case.
"THE COURT: My feeling on that is that he is qualified to testify as to what his studies disclose, and you can take a shot at him in cross-examination if you wish to bring out some of the fallacies. Go ahead. You may answer the question, doctor.
"A. Would you repeat the question, please?
"Q. My question was: based on those studies, do you have an opinion of what the effect that the atropine overdose Dennis Wasserburger suffered will have on him in the future?
"A. Yes.
"Q. What is your opinion, doctor?
"A. It is highly probable that the receptors in Mr. Wasserburger's brain have been affected in a fashion that is entirely consistent with the observations that we have made on animals.
"Q. And what effect will that have on Mr. Wasserburger in a high probability?
"A. Since the function of these receptors is involved in learning and memory, it is highly probable that you will have an alteration of learning and memory processes."

Dr. Oukrop claims that the information furnished prior to trial in accordance with the Wyoming Rules of Civil Procedure did not suggest the possibility of such testimony by Dr. Collins, and Dr. Oukrop was entitled to a ruling that the testimony was not admissible.

The record discloses that Dr. Collins was first made known as a witness in a scheduling conference held by telephone conference call on October 22, 1985, a little less than three months after the complaint was filed. Then, on December 2, 1985, Dr. Collins was listed in a Notice of Experts, and his Curriculum Vitae and a November 6, 1984 report to counsel were attached to the Notice of Experts. Even though the report was limited to the immediate toxic effects of atropine and how those related to Den-

nis' conduct, the Notice of Experts also stated:

"* * * Any or all of the witnesses may testify as to the pharmacology of atropine, its effects, side effects, and propensities. Any or all of the above-referenced experts may testify that the damages suffered by the Plaintiff were a direct result of the drug overdose prescribed by the Defendant and that the injuries and the damages suffered by the Plaintiff were a natural and direct consequence of the Defendant's acts and omissions."

Next, in the Plaintiff's Pre–Trial Submissions filed February 18, 1986, Dr. Collins was identified as a witness "who will testify as to the composition and effects of the drug Atropine by itself and taken in combination with the other drugs given to the Plaintiff, * * *." It should be noted that, in this same pleading, other witnesses were listed with the notation that they would testify as to Dennis' continuing injury and suffering and his changing personality subsequent to the incident.

Dr. Oukrop made no effort to depose Dr. Collins prior to the trial. Before Dr. Collins testified with respect to long-range effects of the drug atropine, Dr. Oukrop did object, claiming that this testimony went outside that disclosed by the pre-trial submissions, constituted a surprise to Dr. Oukrop, and should not be received because it amounted to a disregard of the pre-trial proceedings. The ultimate ruling of the trial court with respect to this objection was:

"THE COURT: Well, gentlemen, I guess I should say I don't believe there is any surprise in this case. * * * You may go ahead."

Dr. Collins then testified that it was highly probable that the receptors in Dennis' brain had been affected and that meant he would have an alteration of learning and memory processes for which there was no known treatment.

Dr. Oukrop attacks the ruling of the trial judge admitting Dr. Collins' testimony contending that the district judge departed from the terms of the pre-trial order. Pri-

mary reliance is placed upon *Smith v. Ford Motor Company*, 626 F.2d 784 (10th Cir. 1980), cert. denied 450 U.S. 918, 101 S.Ct. 1363, 67 L.Ed.2d 344 (1981). Dr. Oukrop argues that the burden Dennis must assume is to establish manifest injustice before the court could expand the pre-trial order in order to justify the admission of this testimony. Other authorities relied upon are *Hale v. Firestone Tire & Rubber*, 756 F.2d 1322 (8th Cir.1985); *Roberto v. Roberto*, 452 F.2d 635 (9th Cir.1971); *Clark v. Pennsylvania Railroad Company*, 328 F.2d 591 (2d Cir.1964), cert. denied 377 U.S. 1006, 84 S.Ct. 1943, 12 L.Ed.2d 1054 (1964); *Globe Cereal Mills v. Scrivener*, 240 F.2d 330 (10th Cir.1956); *Walker v. West Coast Fast Freight, Inc.*, 233 F.2d 939 (9th Cir. 1956); *Fernandez v. United Fruit Company*, 200 F.2d 414 (2d Cir.1952), cert. denied 345 U.S. 935, 73 S.Ct. 797, 97 L.Ed.2d 1363 (1953); and *Fowler v. Crown–Zellerbach Corporation*, 163 F.2d 773 (9th Cir.1947). In presenting his argument, Dr. Oukrop assumes that the challenged testimony constitutes a departure from the pre-trial submissions. Since we do not agree with that assumption, the authorities relied upon by Dr. Oukrop in this argument are distinguishable.

Rule 16, W.R.C.P., is similar to Rule 16, F.R.C.P., relating to pre-trial procedure. The subject also is addressed by Rule 601 of the Uniform Rules for the District Courts of the State of Wyoming. This latter rule is the one on point, and it provides in pertinent part:

"(c) Before pre-trial, counsel shall:

"* * * * * *

"(4) Furnish opposing counsel names and addresses of witnesses with a summary of their expected testimony; * * *."

This rule was complied with in this instance, but Dr. Oukrop contends that the furnished summary circumscribed Dr. Collins' testimony in such a way that he should not have been permitted to testify concerning the long-range effect of an overdose of atropine with respect to Dennis.

We previously have held that any requirement of adherence to a pre-trial order

entered in accordance with our Wyoming Rules of Civil Procedure is a matter of discretion with the trial court. Claims of error in that regard are examined under an abuse of discretion standard. *Caldwell v. Yamaha Motor Company, Ltd.*, Wyo., 648 P.2d 519 (1982); *Chrysler Corporation v. Todorovich*, Wyo., 580 P.2d 1123 (1978); *Ford Motor Company v. Kuhbacher*, Wyo., 518 P.2d 1255 (1974). In this instance, the district court did not rule that testimony would be admitted by, in effect, amending the pre-trial order. The essence of the trial judge's ruling was that the pre-trial submissions were sufficient to discern the tenor of Dr. Collins' testimony. The trial court must be vested with as much discretion in construing its own orders as it is in permitting departure from those orders.

■ The pre-trial submissions in this instance are sufficiently equivocal to justify the district judge in concluding that Dr. Collins' testimony had not been circumscribed in the manner argued by Dr. Oukrop in either the pre-trial submissions of Dennis or in the pre-trial order. In substance, the trial court ruled that Dr. Oukrop was on notice of such potential testimony. Ample opportunity was available prior to trial to depose Dr. Collins or to require Dennis, pursuant to discovery rules, to specify the tenor of his testimony. *Simonsen v. Barlow Plastics Company, Inc.*, 551 F.2d 469 (1 Cir.1977). Under the circumstances, we are not persuaded that the district court committed an abuse of discretion in receiving Dr. Collins' testimony in evidence, despite Dr. Oukrop's claim of surprise.

We turn then to the relevance vel non of Dr. Collins' testimony. Dr. Collins testified as an expert witness, and, essentially, his testimony is covered by Rules 702 and 703, W.R.E. These rules provide:

"Rule 702. Testimony by experts.

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may

testify thereto in the form of an opinion or otherwise.

"Rule 703. Bases of opinion testimony by experts.

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

In this instance, we also must consider Dr. Collins' testimony in the light of Rules 401 and 402, W.R.E. These rules provide:

"Rule 401. Definition of 'relevant evidence'.

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

"Rule 402. Relevant evidence generally admissible; irrelevant evidence inadmissible.

"All relevant evidence is admissible, except as otherwise provided by statute, by these rules, or by other rules prescribed by the Supreme Court. Evidence which is not relevant is not admissible."

In applying these rules, we must recognize that rulings with respect to the admission of evidence are within the sound discretion of the trial court, and those rulings are entitled to considerable deference. E.g., *Arnold v. Mountain West Farm Bureau Mutual Insurance Company*, Wyo., 707 P.2d 161 (1985); *Banks v. Crowner*, Wyo., 694 P.2d 101 (1985); *Caterpillar Tractor Company v. Donahue*, Wyo., 674 P.2d 1276 (1983); *City of Evanston v. Whirl Inn, Inc.*, Wyo., 647 P.2d 1378 (1982); *Coronado Oil Company v. Grieves*, Wyo., 642 P.2d 423 (1982).

In this case, the trial court determined to submit to the jury the issue of whether the overdose of atropine had any long-term deleterious effect upon Dennis. There is no serious question that Dr. Collins was not qualified as an expert in pharmacology-tox-

icology by his knowledge, skill, experience, training and education, and his scientific and specialized knowledge obviously was of assistance to the jury in determining the issue of the long-term effect of the overdose of atropine. The facts or data that he relied upon in forming his opinion come within the scope of Rule 703, W.R.E.

■ Dr. Oukrop objected because Dr. Collins' testimony concededly related to animal testing and did not have any specific relation to Dennis. It is clear that Dr. Collins had not examined in any way or even been acquainted with Dennis prior to trial. His testimony did, however, have a "tendency to make the existence of any fact that is of consequence to the determination of the action [the long-range effect of atropine on Dennis] more probable * * * than it would be without the evidence." Rule 401, W.R.E. The extent of his knowledge and the basis of his opinion clearly were subject to scrutiny by cross-examination; and it was left to the trier of fact to determine his credibility, evaluate his testimony and decide what weight it should be given. *Reed v. Hunter*, Wyo., 663 P.2d 513 (1983). Our evaluation of the record persuades us that the trial court carefully considered the admissibility of Dr. Collins' testimony on this critical issue and in the exercise of its discretion admitted the testimony into evidence. We can perceive no abuse of discretion by the trial judge in receiving this testimony.

We respond to the appellant's first two issues in the negative. Since we conclude that no error occurred in admitting the testimony of Dr. Collins, there is no need to consider whether any error was or was not prejudicial.

The judgment of the district court is affirmed.

BROWN, Chief Justice, dissenting.

The majority apparently was so offended by the outrageous conduct of appellant Ray K. Oukrop, D.D.S., that it suspended the Rules of Evidence and the Rules of Civil Procedure for this one case. A large judgment against appellant is clearly justified, but should have been visited upon him without resort to outlawry.[1]

It seems to me most strange that Allen C. Collins, Ph.D., was allowed to testify as a medical expert. Throughout the trial Collins was referred to and addressed as "doctor," and properly so. However, he is a pharmacologist with a doctorate in philosophy; he is not a medical doctor.[2] Foundation testimony indicated that Collins had researched the effects of Belladonna Alkaloids, such as atropine, on the nervous system and brains of laboratory animals (mice), but had no clinical experience either treating or diagnosing physiological brain dysfunctions in human beings.

At trial, over appellant's objection, Collins gave expert medical testimony, and testified that appellee had permanent brain damage.[3] This is interesting because Collins never examined or treated appellee.

"* * * Only an expert medical witness is competent to testify as to medical matters. * * *" *Harris v. Grizzle*, Wyo., 625 P.2d 747, 751 (1981).

---

1. "* * * [O]utlawry is putting a man out of protection of the law so that he is incapable to bring an action for redress of injuries; and it is also attended with a forfeiture of all one's goods and chattels. * * *" II W. Blackstone, Commentaries *283, 284 (1899). In the United States the concept of outlawry is unknown. *Hall v. Lanning*, 91 U.S. [1 Otto] 160, 23 L.Ed. 271 (1875).

2. As a matter of fact there were several doctors floating around the courtroom the day of the trial. The trial judge, counsel for plaintiff, and counsel for defendant were all doctors—Juris Doctors, that is. Just because a person is addressed "doctor," it does not necessarily follow that he is enfused with medical expertise.

3. If the trial court's ruling was not so prejudicial to appellee, I might change my mind about Collins' so-called expert testimony under the doctrine of "Let it in for what it's worth." In Wyoming, under this doctrine, a lot of irrelevant, immaterial or incompetent evidence gets into trials. The "Let it in for what it's worth" rule of evidence is usually reserved for nonjury trials. The trial judge who invokes this doctrine does so as a sop to the proponent, knowing he is not going to consider it in any event. But, employing this doctrine is dangerous in jury trials. The jury may take the suspect evidence and run with it, as they apparently did here.

Pharmacologists and toxicologists are not trained to diagnose mental injuries. Pharmacology is

> "[t]he science concerned with drugs, their sources, appearances, chemistry, actions and uses." Stedman's Medical Dictionary, 1065 (5th ed. 1982).

Pharmacologists and chemists are qualified to describe the general effects of a drug on the human body. *Roberts v. United States*, 316 F.2d 489, 492–493 (3rd Cir. 1963); and *Stertz v. Briscoe*, 184 Kan. 163, 334 P.2d 357, 361 (1959), 70 A.L.R.2d 1029 (1960). This type of testimony may be characterized as chemical opinion. *State v. Bessette*, 130 Vt. 438, 296 A.2d 179, 181 (1972). Therefore, an expert witness called upon to give an opinion on permanent brain damage logically should be a neurosurgeon, neurophysiologist or a clinical psychiatrist, not a doctor of philosophy or a pharmacologist with a Ph.D. in philosophy.

My main concern about this case, however, is the element of surprise, or stated another way, "trial by ambush." There is no way appellant's counsel could have known that appellee's principal claim for damages was permanent brain damage. In the middle of the trial appellee revealed for the first time that he was claiming damages for permanent brain injury and that Collins would testify as an expert in support of that claim. Neither appellee's complaint nor opening statement gives any hint that permanent brain damage is claimed as an element of damages, and says nothing to indicate that Collins would testify as though he were a medical doctor. Rather, the complaint and opening statement pleads a case of knee injury as a result of hallucinations. Also, the depositions of appellee, his mother and family physician describe a case of knee injury. Three physicians (not doctors of philosophy, juris doctors or doctors of Divinity), testified at trial; they said nothing about brain damage.

Appellee gave notice of the substance of Collins' testimony when he filed his "Notice of Experts." The notice incorporated by reference an opinion letter from Collins to appellee's counsel dated November 6, 1984.

The letter was never modified nor supplemented, and represented the sum and substance of Collins' proposed testimony. It partially states:

> " * * * As I mentioned above, there is no doubt in my mind that the symptoms described are due to the overdose of atropine. I should mention, however, that atropine toxicity is rarely fatal and long term toxic effects are rare. If the patient survives the first 24 hours the prognosis is usually excellent. This is also consistent with the records that I have seen for this case."

The letter does not disclose that Collins had formed an opinion that appellee suffered from permanent and worsening brain damage, and counsel for appellant had no reason to suspect that Collins would give such testimony, i.e., testimony that should be elicited from a neurosurgeon, neuropsychologist or clinical psychologist.

On February 18, 1986, appellee filed a document entitled "Plaintiff's Pre–Trial Submissions," which contained a section pertaining to the designation of witnesses. He listed Collins as a witness who would " * * * testify as to the composition and effects of the drug Atropine by itself and taken in combination with the other drugs given to the Plaintiff, to-wit: Mephyton, demerol and Decadron." Nowhere did appellee give any indication that Collins would give a *medical opinion* that appellee suffered from permanent and worsening brain damage. Appellee specifically designated physicians as the persons who would provide testimony on the issue of causation and damages. The designation pertaining to Collins says nothing about damages suffered by appellee, and the absence of such a designation leads to the logical conclusion that appellee was *not* designating Collins as someone who would testify about damages. Therefore, counsel would not suspect that a pharmacologist or doctor of philosophy would be qualified to provide a medical diagnosis of brain damage, and the designations would not lead a reasonable person to suspect that Collins would attempt to do so.

On February 25, 1986, the court entered its "Pretrial Conference Report and Order." There is no mention in either the order or the pretrial memoranda that appellee would seek to prove by Collins' testimony that appellee was suffering from worsening brain damage. Rule 16, W.R.C.P., provides:

"The court shall make an order which recites the action taken at the conference, the amendments allowed to the pleadings, and the agreements made by the parties as to any of the matters considered, and which limits the issues for trial to those not disposed of by admissions or agreements of counsel; and such order when entered controls the subsequent course of the action, unless modified at the trial to prevent manifest injustice."

Absent amendment or modification, the parties were bound by the contents of the pretrial order. The order not only limited the issues, but it also limited the scope of the proposed testimony to that contained within the designation. *Smith v. Ford Company,* 626 F.2d 784 (10th Cir.1980). The majority does not challenge this point of law, but instead side-steps it by misapplying the standard of review. In *Smith,* the Tenth Circuit quoted from *Trujillo v. Uniroyal Corp.,* 608 F.2d 815, 817–818 (10th Cir.1979), where it had earlier held:

" ' * * * When there exists a "properly drawn, detailed pretrial order, a trial court's determination that certain facts or issues must [or should not] be excluded from trial on the basis of a pretrial order may be reversed only if there is an abuse of discretion. [Citation.]" * * * .' " *Smith v. Ford Motor Company,* supra, at 795.

The majority applies this rule by stating that "[t]he pre-trial submissions in this instance are *'sufficiently equivocal'* to justify the district court's conclusion that Collins' testimony had not been circumscribed in the manner argued by Dr. Oukrop [appellant] in either pre-trial submissions of Dennis [appellee] or in the pre-trial order. * * *" (Emphasis added.) Majority at 238. The pre-trial order in this case was "properly drawn" in terms of Collins testi-

fying as a pharmacologist, and the trial court had discretion to allow expert testimony under that order. It could deviate from that order at trial only to prevent a manifest injustice. See *McCabe v. Manning Construction Co.,* Wyo., 674 P.2d 699, 703–704 (1983). The basic purpose for having a pre-trial order is, in part, to try to put all of the parties on equal and fair notice about what evidence will be presented by the expert witnesses to be called in the trial. 6 C. Wright and A. Miller, Federal Practice and Procedure § 1527 at 604–615 (1971). In *Clark v. Pennsylvania Railroad Company,* 328 F.2d 591, 594 (2d Cir.1964), cert. denied 377 U.S. 1006, 84 S.Ct. 1943, 12 L.Ed.2d 1054 (1964), the court stated:

" * * * One of the prime objectives of this new, but now firmly established procedural device [Rule 16], is to do away with the old sporting theory of justice and substitute a more enlightened policy of putting the cards on the table, so to speak, and keeping surprise tactics down to a minimum. * * *"

See also *Hale v. Firestone Tire & Rubber,* 756 F.2d 1322, 1335 (8th Cir.1985); *Walker v. West Coast Fast Freight,* 233 F.2d 939, 941 (9th Cir.1956); *Fernandez v. United Fruit,* 200 F.2d 414, 415 (2d Cir.1952); *Fowler v. Crown–Zellerbach Corporation,* 163 F.2d 773, 774 (9th Cir.1947).

Undisclosed testimony at variance with the pre-trial order should not be allowed if it causes surprise. Apparently, the trial court believed that appellant should have anticipated Collins' testimony and taken his deposition.

*Smith v. Ford Company,* supra, was a case similar to this case. In *Smith,* plaintiff, who had incurred an injury to his pancreas, filed a pretrial memorandum designating a physician as one of his witnesses. The witness designation filed with the court made no mention of the fact that the physician would testify that the injury to the pancreas was due to the location of the seatbelt within the automobile. The designation said only that the physician would discuss the medical treatment of the plaintiff and his prognosis. Relying on this

242

limited designation, counsel for defendant decided that a deposition of the physician would not be necessary. In its opinion, the Tenth Circuit Court of Appeals placed the burden upon plaintiff to apprise the defendant in advance of trial of the nature of the expert's testimony. The burden was upon the plaintiff to articulate the subject matter of those areas about which his expert would be testifying. If this had been done, the defendant "could have taken his deposition," if deemed essential.

I cannot subscribe to the majority's view that any pre-trial order that is "sufficiently equivocal" or otherwise ambiguous concerning the substance of expert witness testimony can be used to affirm the trial court under the abuse of discretion standard of review.

I would reverse this case and remand for a new trial for the reason that appellant never received fair notice that a nonmedical witness was going to give a medical opinion on brain damage, and that Allen C. Collins, Ph.D., did not possess medical credentials to testify as a medical expert on brain damage to human beings.