Tonya WINTERHOLLER, Ronald Winter-holler, and Jon Winterholler by Ronald Winterholler, His Father and Next Friend, Appellants (Plaintiffs),

v.

Leonel ZOLESSI, M.D., Appellee (Defendant).

Nos. 98–246, 98–274.

Supreme Court of Wyoming.

Nov. 4, 1999.

Representing Appellants: Walter Urbigkit, Frontier Law Center, Cheyenne, WY. Argument by Mr. Urbigkit.

Representing Appellee: Jeffrey C. Brinkerhoff and Hampton K. O'Neill of Brown, Drew, Massey & Sullivan, Casper, WY. Argument by Mr. Brinkerhoff.

Before LEHMAN, C.J., and THOMAS, MACY, GOLDEN, and HILL, JJ.

HILL, Justice.

Following a jury's rejection of Appellant Tonya Winterholler's malpractice claim arising from Appellee Dr. Zolessi's performance of a laparoscopic hysterectomy, Appellant filed the two consolidated appeals. In Case No. 98–246, Appellant claims that she was denied a fair trial when the district court limited her to one standard of care expert only days before trial and, at trial, refused to allow her treating physicians to express criticism of Dr. Zolessi's care. Appellant also argues that she was denied a fair trial when the district court refused to permit her substituted expert to testify regarding his opinion that Dr. Zolessi's placement of surgical hardware was below the standard of care. Finally, Appellant contends that the district court abused its discretion in allowing Dr. Zolessi to present evidence of Appellant's teenage abortion.

In Case No. 98–274, Appellant claims that the district court erred in awarding costs to Dr. Zolessi without a hearing. Finding that the district court abused its discretion in excluding the late-discovered expert opinion, and that the order limiting Appellant to one standard of care expert is not based upon the facts of this case, we reverse in part and remand. Due to the resolution of Case No. 98–246, Case No. 98–274 regarding the award of costs is moot.

## ISSUES

In Case No. 98–246, Appellant lists five lengthy issues for consideration. In a shortened version, they are as follows:

1. Whether the Court's decision that surprise to Defendant justified the exclusion of testimony by Plaintiffs'[1] designated expert witness was an abuse of discretion?

2. Whether the Court's decision was legally unjustified, factually improper, and an abuse of discretion in restricting Plaintiffs to one expert witness for any standard of care testimony?

3. Whether the Court's decision was an abuse of discretion, in violation of litigants' guaranteed rights to a fair trial and factually erroneous in limiting Plaintiffs' treating physicians from providing testimony which was considered critical of the Defendant surgeon's [actions]?

4. Whether the Court's decision was an abuse of discretion when determining that defense counsel had an unqualified right to require [Appellant] to submit to examination by Defendant's designated expert witness?

5. Whether the Court's decision was an abuse of discretion in determining that a teenage abortion which had occurred thirteen years before the hysterectomy surgery could be introduced into evidence?

Appellee consolidates the issues as follows:

1. Whether it was a reasonable exercise of discretion for the trial court to strike Dr. Oliphant's new, previously undesignated, undisclosed, surprise, and contradictory opinion, first offered late on the eve of trial, concerning Dr. Zolessi's alleged "negligent" placement of the trocar?

2. Whether it was a reasonable exercise of discretion for the trial court to limit plaintiffs to one expert on the issue of standard of care to testify at trial to avoid unnecessary, cumulative, inconsistent and confusing testimony from plaintiffs' various experts?

3. Whether it was a reasonable exercise of discretion for the trial court to allow evidence of the plaintiff Tonya Winterhol-ler's abortion as part of her pertinent medical history, when her previous medical history, including a complication following her abortion, was relevant to her claim that Dr. Zolessi misdiagnosed chronic pelvic inflammatory disease?

In Case No. 98–274, we decline to repeat the parties' lengthy statement of issues and restate the issue as:

Whether the district court abused its discretion in awarding costs to Appellee without scheduling, *sua sponte*, a hearing on the matter?

## FACTS

For approximately four years, Dr. Zolessi treated Appellant for tubal pregnancy problems and other obstetric and gynecological complaints. Treatment culminated in Dr. Zolessi's performance of Appellant's laparoscopic hysterectomy in late March of 1992. Laparoscopic surgery requires the surgeon to place a laparascope through the umbilicus and then, through small incisions at various locations in the abdomen, place two or three surgical instruments, known individually as a trocar, through which the surgical tools are manipulated.

The day following surgery, after recovery from the effects of the anesthesia, Appellant experienced severe back pain and discovered bruising into her flank, abdomen, and left labia. Problems persisted after her release and, on April 11, 1992, Appellant returned to the emergency room complaining of back pain. At her next scheduled appointment with Dr. Zolessi on the 13th of April, Appellant sought an explanation as to the bruising and why she was continuing to experience pain. Dr. Zolessi surmised that the anesthesia through an epidural procedure may have caused the post-surgery bleeding.

Appellant continued to experience pain and received no satisfactory answer, as to its cause, from a series of doctors. Appellant eventually consulted Dr. Steven Freedman, a California board certified obstetrician/gynecologist, in May, 1992. Dr. Freedman diag-

1. The claimants below and on appeal include Ms. Winterholler and members of her family. For simplicity, we will refer to Ms. Winterholler as Appellant.

nosed her problem as stemming from the severing of an epigastric artery due to the placement of the trocar during the laparascopic procedure. Following this diagnosis, Appellant came under the care of Dr. Painter, who arranged an appointment with another specialist for possible treatment.

In March of 1994, Appellant and her family filed a complaint alleging medical negligence in Dr. Zolessi's pre-surgical, surgical, and post-surgical care. Essentially, Appellant claimed that she was not given sufficient information about the risks of the surgery, that Dr. Zolessi was negligent in performing the surgery and in failing to recognize that the epigastric artery was severed, and that he failed to provide reasonable post-surgical treatment. Appellant designated three expert witnesses in April of 1995—her treating physicians, Dr. Freedman and Dr. Painter, and another obstetrician/gynecologist, Dr. Woodard. All were deposed by the defense during discovery. At one point during Dr. Painter's deposition, Dr. Zolessi's counsel advised Appellant's counsel that three standard of care experts was excessive.

In May of 1997, Appellant took the trial deposition of Dr. Freedman, as he could not attend the trial in person. On September 23, 1997, Ms. Winterholler filed a motion for a continuance of the trial date because of the health problems of her expert, Dr. Woodard. Dr. Zolessi objected, claiming that Dr. Woodard's testimony was not necessary since Dr. Freedman and Dr. Painter were also designated to give opinions on the standard of care. The district court continued the trial from October of 1997 to June of 1998.

In February, due to Dr. Woodard's failing health, Appellant filed a motion to substitute Dr. Oliphant, another obstetrician/gynecologist, to take Dr. Woodard's place at trial. The trial court granted the motion, and Dr. Oliphant's deposition was taken on April 20, 1998, approximately six weeks before the trial date. The morning of the deposition, Dr. Oliphant conducted a physical examination of Appellant. Based upon that examination, Dr. Oliphant offered his opinion at his deposition that the placement of the trocar fell below the applicable standard of care.

Shortly thereafter, Dr. Zolessi filed a motion to strike this opinion and a motion to limit Ms. Winterholler to one standard of care expert. A hearing on the pending motions was held on May 20, 1998. On May 21, the trial court issued a decision letter granting the motion to strike the opinion of Dr. Oliphant relating to the placement of the trocar and ordering plaintiffs to choose one standard of care expert. Appellant chose Dr. Oliphant as her standard of care witness; however, he was not permitted to testify regarding the negligent placement of the trocar. At trial, the jury heard the testimony of Dr. Painter and portions of Dr. Freedman's deposition, but Appellant was not permitted to present testimony from these witnesses criticizing Dr. Zolessi's care. The jury found in favor of Dr. Zolessi, and judgment was entered on June 26, 1998. A timely appeal followed.

Pursuant to U.R.D.C. 501 and W.R.C.P. 54(d), Dr. Zolessi served his certificate of costs on July 20, 1998, in the amount of $10,028.84. Appellant filed a resistance to these costs, and Dr. Zolessi then filed a response. The trial court awarded a majority of the costs submitted by Dr. Zolessi, $8,474.30, without a hearing. Appellant appealed the district court's order, and the cases were consolidated by this Court.

## STANDARD OF REVIEW

Each of the issues raised by Appellant are governed by an abuse of discretion standard of review. We have described this standard as follows:

> The admission or exclusion of expert testimony is a decision within the sound discretion of the district court, and its decision will not be overturned absent a showing of clear and prejudicial abuse of discretion. *Yung v. State*, 906 P.2d 1028, 1037 (Wyo.1995).

> "Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. *Byerly v. Madsen*, 41 Wash.App. 495, 704 P.2d 1236

(1985)." *Vaughn v. State*, 962 P.2d 149, 151 (Wyo.1998) (quoting *Martin v. State*, 720 P.2d 894, 897 (Wyo.1986)).

*Rogers v. State*, 971 P.2d 599, 601 (Wyo. 1999).

## DISCUSSION

### Case No. 98-246

#### 1. *Preclusion of Expert Opinion Due to Unfair Surprise.*

 Appellant contends that the trial court abused its discretion in precluding Dr. Oliphant's opinion that Dr. Zolessi's placement of the trocar was below the standard of care. She maintains that the error lies in the trial court's determination that this opinion came as an unfair surprise to the defense which, therefore, did not have adequate time to respond to the issue prior to trial. In essence, Appellant claims that the district court erroneously restricted the development of her theory of the case. "This is a threshold concern because a litigant usually is entitled to a remand and a new trial if it was unfairly prejudiced in the presentation of its case." *Stauffer Chemical Company v. Curry*, 778 P.2d 1083, 1100 (Wyo.1989). On appeal, the question is whether the trial court could reasonably find that the "avoidance of possible hardship to parties and the accomplishment of substantial justice to the merits of [the] claims" was best served by the exclusion of Dr. Oliphant's opinion that the placement of the trocar was negligent. *Ford Motor Company v. Kuhbacher*, 518 P.2d 1255, 1260 (Wyo.1974).

Initially, we note that Dr. Zolessi does not refer us to a specific rule under which the district court excluded that portion of Dr. Oliphant's testimony. Rather, he argues that the trial court's decision is an appropriate exercise of the court's inherent power to limit and otherwise control the admissibility of proffered expert testimony. We have identified two sources for this authority in the past, W.R.C.P. 16,[2] (*Salveson v. Cubin*, 791 P.2d 581, 582, fn. 1 (Wyo.1990); *Oukrop v. Wasserburger*, 755 P.2d 233, 237–38 (Wyo. 1988)); and W.R.E. 401–403.[3] *Hall v. Hall*, 708 P.2d 416, 421 (Wyo.1985); *Kobos v. Everts*, 768 P.2d 534, 545 (Wyo.1989).

Dr. Zolessi infers that the trial court's decision may be founded on W.R.C.P. 16 because Dr. Oliphant's opinion was given after the expert designations were filed and only shortly before trial. He maintains that the circumstances of this case are similar to those in *Salveson, supra.* There, in a medical malpractice case, plaintiffs sought to add a handwriting expert to testify concerning the physician's office notes after the expert designation deadline. The trial court prohibited the late listing, reasoning that it related to a peripheral issue which should have been disclosed in discovery. The trial court concluded that the request for a handwriting expert "is creating issues way beyond what was contemplated by the parties.... [This issue] seems to be developed as an afterthought and could have been contemplated and dealt with during the discovery period." *Salveson*, 791 P.2d at 583. On appeal, this Court held that no abuse of discretion occurred because there could have been a timely designation of the witness at the pretrial conference. We further found that the appellee would have been "ambushed" if the expert were permitted to testify on rebuttal.

---

2. W.R.C.P. 16(f) provides:
 *Sanctions*—If a party or party's attorney fails to obey a scheduling or pretrial order, or if no appearance is made on behalf of a party at a scheduling or pretrial conference, or if a party or a party's attorney is substantially unprepared to participate in the conference, or if a party or party's attorney fails to participate in good faith, the judge, upon motion or the judge's own initiative, may make such orders with regard thereto as are just, and among others any of the orders provided in Rule 37(b)(2)(B), (C) and (D).
 W.R.C.P. 37(b)(2)(B) permits an "order refusing to allow the disobedient party to support or

oppose designated claims or defenses, or prohibiting the disobedient party from introducing designated matters into evidence."

3. W.R.E. 403 provides:
 **Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.**
 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Dr. Zolessi argues that, here, Appellant had four years to designate expert testimony on the negligent placement of the trocar but did not do so until weeks before the trial. Thus, as in *Salveson*, the belated claim is an afterthought. Dr. Zolessi further contends that, if admitted, Dr. Oliphant's testimony on the trocar placement would have required Dr. Zolessi to retain a new expert to respond to the claim. We find the analogy to *Salveson* misplaced. Unlike the circumstances in *Salveson*, the opinion proffered by Dr. Oliphant was not a collateral issue. It was an opinion directly related to Appellant's claim that the surgery was below the standard of care. In addition, Dr. Oliphant was not retained as an expert in this case until Dr. Woodard could no longer participate. Therefore, Dr. Oliphant's opinion could not have been known at an earlier time. Finally, Dr. Zolessi's designated standard of care witness, Dr. Townsend, is a well-qualified board certified obstetrician/gynecologist. The designation stated that Dr. Townsend was prepared to testify that Dr. Zolessi "properly performed the surgery." Therefore, Dr. Zolessi's need to employ a new expert to respond to this issue is unsupported by the record.

On the other hand, Appellant likens the facts of this case to those found in *Oukrop, supra*. In that case, the trial court admitted the expert testimony of Dr. Collins as to the long-range effects of a drug over defendant's objection that the testimony exceeded the pretrial disclosure. While the disclosure of Dr. Collins' testimony and his report were limited to the immediate toxic effects of the drug, the Notice of Experts also stated that any of the listed witnesses may testify regarding the propensities of the drug, and that the damages suffered by the defendant were a direct result of the drug overdose prescribed by the defendant. 755 P.2d at 237. Due to the submissions prior to trial, the trial court found no unfair surprise. We agreed, stating, "[i]n substance, the trial court ruled that [there was ample] notice of such potential testimony." *Id.* at 238. Appellant claims that, as in *Oukrop*, Dr. Zolessi had ample notice of Appellant's claim that the placement of the trocar was a substantial causative factor in the severance of her epigastric artery and subsequent pain.

Looking to the record, there is no doubt that Dr. Freedman and Dr. Woodard were questioned regarding trocar placement. It is also beyond question that neither of these experts specifically stated that the trocar placement was below the standard of care. In Dr. Freedman's discovery deposition in 1995, he testified that the placement of the trocar was not below the standard of care, but rather, it was "bad technique and poor judgment." Dr. Freedman's trial deposition in 1997, however, clarified this statement as follows:

Q. Now, with respect to the placement of the trocars, that's another example of how different surgeons can place those trocars differently, correct?

A. No, sir. As we learn our techniques, we learn various ways to stay out of trouble, and one of the ways of staying out of trouble is to not put the trocars where he put them, and, therefore, it is not beneath the standard of care as I testified today. It is poor judgment and bad technique.

Q. But the answer to my question, first of all, is that there are different techniques in placing the trocars, as well as different techniques of every aspect of the surgery?

A. Well, that would imply that under some circumstances this would be considered good technique, and the answer is no, it is never considered good technique. In other words, as a teacher of the technique, as I'm instructing my students, I would tell them there are different alternatives for the placement, but this would never be listed as one of the alternatives.

. . . .

Q. [In your previous deposition you answered] "There are different ways of doing every aspect of the procedure starting with even the trocar placement." That was your answer on that date; correct?"

A. But Jeff, you see, you're confusing the issue. The issue is you can safely place the trocar in many places.

Q. Thank you.

A. And that is my testimony. But his placement of the trocar would not be included in those alternative placements.

Q. You placed the trocar differently than Dr. Zolessi did?

A. *I'm saying that as you learn proper placement of the trocar, there are safe places to put it and unsafe places. Where he put it would be included in the list of unsafe places.*

. . . .

Q. . . . Doctor, your testimony is that while you placed the trocars differently, the way he placed the trocars met the standard of care; isn't that true?

. . . .

A. If our interest is to allow the jury to understand the issue, as I've testified, the—there are a number of ways of placing trocars, and we are taught that there are areas to avoid while placing the trocars. Dr. Zolessi placed the trocars in an area that we are all trained to avoid. It is not beneath the standard of care. It is just bad technique.

Q. Doctor, the answer to my question is Dr. Zolessi's placement of the trocars met the standard of care, correct?

. . . .

A. *There is a difference between falling beneath the standard of care or meeting the standard of care. I believe it did neither.* Certainly if Dr. Zolessi was my student and he was placing his trocars in that way, I would strongly admonish him and tell him never to do it that way again.

(Emphasis added.)

Dr. Woodard's opinion letter generally stated "complications . . . due to . . . procedure suggest less than optimal technique and skill." In his deposition, however, he also took the opportunity to expand on this statement. First, he testified, "[t]he surgical procedure just didn't happen in a way that would seem to be standard. In other words, it seems like a substandard operation, and the end result sort of speaks for itself." Later in the deposition, he responded to defense counsel's questions as follows:

Q. In any event, I take it that it is your opinion that her chronic back pain resulted from the use of the aquapurator which dissected pelvic nerves?

A. Coupled with the injury to the epigastric artery.

Q. Right. And how in your opinion was the epigastric artery injured?

A. The laparoscopy involves several ports, small incisions, one in the naval, one immediately in the midline, the suprapubic area, and two ports laterally in the abdominal wall in the area of McBurney's point, which is where appendical incisions are frequently made, except this was on the left side not the right side. These incisions are usually 2½ centimeters in length or less, sometimes more.

The incision that was placed by Dr. Zolessi was not in the position that was optimal. Optimal position means it's lateral to the rectus muscle, more near the anterior superior iliac spine, which is a bony landmark. . . .

. . . .

Q. I think you've told me that you believe that the pain was caused—first one element of that chronic back pain was the dissection of the pelvic nerves by the aquapurator; is that correct?

A. Yes.

Q. And another explanation for the pain was the puncture or dissection of the epigastric artery when he put one of the trocars in; is that correct?

A. *That's correct. . . .So it's a combination, not a single item.*

(Emphasis added.) In light of this testimony, it is clear that Appellant's experts were critical of the trocar placement but did not definitively state that it was below the standard of care. Thus, the alleged surprise in this case is that Dr. Oliphant took the next step and was the first expert to clearly state that the trocar placement was below the standard of care.

■ We are mindful that "where the authority to perform a proposed action rests within the discretion of the court we must allow considerable latitude in which he may exercise his discretion." *Waldrop v. Weaver,* 702 P.2d 1291, 1294 (Wyo.1985) (*quoting Carman v. Slavens,* 546 P.2d 601, 603 (Utah 1976)). However:

[T]his does not mean that the court has unrestrained power to act in an arbitrary manner. Fundamental to the concept of the rule of law is the principle that reason and justice shall prevail over the arbitrary and uncontrolled will of any one person; and that this applies to all men in every status: to courts and judges, as well as to autocrats or bureaucrats. The meaning of the term 'discretion' itself imports that the action should be taken within reason and good conscience in the interest of protecting the rights of both parties and serving the ends of justice. *It has always been the policy of our law to resolve doubts in favor of permitting parties to have their day in court on the merits of a controversy.*

*Id.* (emphasis added). We have recognized that "avoidance of possible hardship to parties and the accomplishment of substantial justice to the merits of claims should be among the factors which the trial court considers." *Ford Motor Company,* 518 P.2d at 1260 (Wyo.1974).

In deciding whether a party's supplementation of its disclosures after the conclusion of expert discovery is fair under the circumstances, courts have considered the following factors:

(1) whether allowing the evidence would incurably surprise or prejudice the opposing party;

(2) whether excluding the evidence would incurably prejudice the party seeking to introduce it;

(3) whether the party seeking to introduce the testimony failed to comply with the evidentiary rules inadvertently or willfully;

(4) the impact of allowing the proposed testimony on the orderliness and efficiency of the trial; and

(5) the impact of excluding the proposed testimony on the completeness of the information before the court or jury.

*Dada v. Children's National Medical Center,* 715 A.2d 904, 909 (D.C.1998) (quoting *Weiner v. Kneller,* 557 A.2d 1306, 1311–12 (D.C. 1985)). *See also* Gregory P. Joseph, American Law Institute, *Emerging Expert Issues Under the 1993 Disclosure Amendments to the Federal Rules of Civil Procedure,* 29 (1999), and cases cited therein. In those instances in which the trial court relies on W.R.E. 403, unfair surprise is relevant to the trial court's consideration of unfair prejudice to the opposing party. Thus, the factors mentioned above will be relevant to the trial court's determination under W.R.E. 403, as well. *See Magyar v. Wisconsin Health Care Liability Insurance Plan,* 211 Wis.2d 296, 564 N.W.2d 766, 769–70 (1997) (proper analysis is to weigh the probative value of the testimony against the danger of unfair surprise).

The record is silent as to how the trial court weighed the importance of Dr. Oliphant's testimony against Dr. Zolessi's claim of surprise. The trial court merely stated, "I feel the defense has not had and will not have sufficient time to respond to this new opinion." Applying the considerations enumerated earlier, we find no indication that Appellant willfully failed to comply with the evidentiary rules. Dr. Oliphant was designated as a witness only when Dr. Woodard could not continue in this capacity. Dr. Oliphant performed his examination and was available for deposition approximately one month after the trial court allowed his substitution and eight weeks before trial. Given the credentials and involvement in the case of Dr. Zolessi's expert, we find nothing which indicates that this time was insufficient to formulate a response. Finally, the absence of Dr. Oliphant's opinion clearly prevented the jury from hearing all the information regarding Appellant's claims.

Thus, we are unable to find support in the record for the conclusion that the admission of Dr. Oliphant's testimony would *incurably* surprise or prejudice the defense. It is not difficult, however, to see that the exclusion of the opinion stating there was a breach of the standard of care prejudiced Appellant's ability to present the merits of her malpractice claim. In light of the record before us, we must conclude that the district court abused its discretion in excluding Dr. Oliphant's opinion, and, therefore, reverse and remand.

*2. Limitation to One Standard of Care Expert.*

Appellant contends that the district court abused its discretion in limiting her to one

standard of care expert even though Dr. Zolessi had made no objection to the three designated experts until four weeks before the trial. Appellant claims the court abused its discretion primarily because the decision inappropriately establishes a rule of law allowing but one standard of care expert per specialty in every case. Dr. Zolessi refutes this allegation, stating that he sought "only to establish that, under *the unique facts and circumstances of this case*, such a limitation was a reasonable exercise of the trial court's discretion." Since this issue is likely to arise on remand, we address it here.

■ There is no rule limiting the number of witnesses a party may call on a particular fact or issue. *Mintun v. State*, 966 P.2d 954, 959 (Wyo.1998). W.R.E. 403 permits a trial court to exclude relevant evidence for "considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Id.* This rule is to be used sparingly because it excludes evidence which is concededly relevant and probative. *Towner v. State*, 685 P.2d 45, 49 (Wyo.1984).

■ It is well-established that the determination under W.R.E. 403 is a matter within the discretion of the trial court. *Kobos By and Through Kobos v. Everts*, 768 P.2d 534, 546 (Wyo.1989). In *Kobos* we stated:

> Not all evidence which is entirely duplicative is therefore cumulative and excludable. Evidence may vary in degree of persuasiveness, and when an item of proof which is offered on a point is very different in character or persuasive impact from an item of proof previously received, the former cannot be considered merely "cumulative" of the latter. Moreover, at times it is entirely reasonable for a party to insist, "One witness is good, but two or three will make my case much stronger, even though all will testify in a similar vein." In short, the discretion of the trial judge to exclude cumulative evidence must be exercised in a discriminating fashion, and with wisdom, particularly where the evidence in question goes to issues of central importance in the case. (*Quoting* 2 D. Louisell and C. Mueller, *Federal Evidence* § 128 at 74–75 (footnote omitted) (citations omitted)).

> The trial court retains considerable latitude even with admittedly relevant testimony in rejecting evidence which is cumulative or in requiring that evidence be brought to the jury's attention in a manner least likely to cause confusion. However, the litigant "is entitled to an opportunity to adduce relevant, competent evidence bearing on the issues to be tried." *Hamling v. United States*, 418 U.S. 87, 125, 94 S.Ct. 2887, 2911–12, 41 L.Ed.2d 590, reh'g denied 419 U.S. 885, 95 S.Ct. 157, 42 L.Ed.2d 129 (1974). Thus, evidence which in the context of the litigation is merely repetitious or time consuming may be excluded, but only if time consideration substantially outweighs the incremental probative value of the proffered evidence. M. Graham, Handbook of Federal Evidence § 403.1 at 179 (2d ed.1986).

*Id.* at 546.

■ As can be seen by the guidelines discussed above, each determination must be made on the facts of the case before the judge. Our review of the record leads us to conclude that the trial court's determination was not based upon the unique facts of the case, but rather, it laid down a general rule excluding more than one expert to testify on the standard of care.

The district court ruled that Appellant would have to choose one of these experts to testify regarding the standard of care. The basis of the trial court's decision was stated as follows:

> My reasoning on the above limitation to one standard of care expert is that *allowing more than one witness on such an issue would merely encourage each party to call more witnesses to support their position*. Such encouragement would unduly lengthen the trial, waste time and be cumulative. To the extent the opinions are alleged to be inconsistent, the specter of confusion of the issues seems quite high.

(Emphasis added.) The concern that allowing more than one expert witness for Appellant would encourage Appellee to also designate several witnesses was not present in this case. Appellant's designation of three experts at the outset of trial, years before the trial court's decision, generated the des-

ignation of but one expert on the standard of care on behalf of Dr. Zolessi. At the motions hearing, counsel for Dr. Zolessi stated, "as far as standard of care, I'm willing to live or die with him. That's the way it is in every case." Thus, the record supports Appellant's contention that the trial court's decision was based on the application of a general rule rather than the facts of this case.

■ In addition, the trial court stated that "[t]o the extent the opinions *are alleged* to be inconsistent, the specter of confusion of the issues seems quite high." (Emphasis added.) Allegations of confusion are an insufficient foundation on which to exclude evidence. Moreover, our review of the record reveals that the allegations of inconsistency at the hearing may be generously characterized as overstated. Defense counsel alleged that "Dr. Freedman had no criticisms about the placement of the trocars." As discussed earlier in this opinion, Dr. Freedman seemed to have fairly substantial criticism of the trocar placement. Defense counsel also represented that "Dr. Freedman essentially had no informed consent criticisms," but that "Dr. Woodard, the original expert designated, did have." Any inconsistencies within Dr. Freedman's trial deposition and Dr. Woodard's opinion were irrelevant, given that Dr. Woodard was no longer a potential witness at the trial.[4]

■ Dr. Zolessi's final argument to the trial court discussed unfair prejudice. Counsel stated, "I think it would be unfair for the Plaintiff to have three witnesses all addressing the standard of care issue. The inference to the jury is that I could only find one person to support my case, and yet, he's got three to support his." While this may be true, Dr. Zolessi opted to designate one expert knowing Appellant designated three. In any event, the question is not numbers but the substance and need for the testimony offered and whether the inconsistencies in expert testimony are such that the jury could weigh the conflicting information for itself.

On remand, we urge the trial court to address these issues should it determine that Appellant be limited to one standard of care expert under W.R.E. 403.

### 3. Evidence of Teenage Abortion.

■ Appellant claims the district court abused its discretion in admitting evidence of her teenage abortion which had occurred 13 years before the hysterectomy surgery. Appellant claimed the incident had "no relevance to the issues presented by her present complaint of 1992 medical malpractice," or if relevant, it "should be excluded because of the nature of the evidence in raising religious and adverse reactions which are unfairly prejudicial." We disagree.

Appellant alleged that Dr. Zolessi was negligent in his diagnosis of pelvic inflammatory disease as the basis for the hysterectomy. The trial court did not abuse its discretion in finding that to defend the claims of misdiagnosis and unnecessary surgery, Dr. Zolessi should be permitted to develop evidence explaining why he made his diagnosis. That evidence necessarily includes the patient's medical history pertinent to the diagnosis. The abortion was mentioned several times in her medical records, and expert testimony was presented which established that a prior abortion is a relevant fact to a diagnosis of pelvic inflammatory disease. As to the prejudicial nature of this evidence, the trial court correctly determined that this concern could be effectively addressed during voir dire.

### Case No. 98–274

■ The second appeal addresses the propriety of the district court's order allowing Dr. Zolessi approximately $8,474.00 in trial costs pursuant to U.R.D.C. 501 and W.R.C.P. 54(d). Both rules permit the trial court to award specific costs to the prevailing party. Because we are remanding this case to the district court, the issues in Case No. 98–274 are moot.

---

**4.** We note that at his trial deposition, Dr. Freedman testified "[t]he evidence provided by the patient implies that with regard to informed consent and the patient's awareness of her alternatives or options with regard to her gynecological problems was beneath the standard of care. With regard to informed consent documentation, I have not been able to find that documentation, and, therefore, must conclude it inadequate, in that it's not present in the records that I received."

## CONCLUSION

The district court abused its discretion when it determined that the avoidance of possible hardship to parties and the accomplishment of substantial justice to the merits of the claims was best served by the exclusion of Dr. Oliphant's opinion that the placement of the trocar was negligent. The court also failed to consider the facts of the case when ruling on Dr. Zolessi's motion to limit Appellant to one standard of care expert. On that basis, we reverse and remand this matter. We find no abuse of discretion, however, in the trial court's admission of evidence relating to Appellant's prior medical history.

Because Case No. 98–246 is reversed and remanded, we vacate the appeal in Case No. 98–274 challenging the award of costs.